**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CINDY BOBRYK, *et al.*<br><br>Plaintiffs,<br>v.<br><br>DURAND GLASS MANUFACTURING COMPANY, INC., *et al.*<br><br>Defendants. | CIVIL ACTION NO 1:12-05360<br><br>**NOTICE OF MOTION** |

**PLEASE TAKE NOTICE** that, upon the accompanying Brief in Support of Plaintiffs' Motion and the exhibits attached thereto, Plaintiffs Cindy Bobryk and others, will move this Court at the United States District Court for the District of New Jersey, Mitchell H. Cohen Building & U.S. Courthouse, 4th & Cooper Streets, Camden, NJ 08101, in accordance with the dates and times set forth in this Court's Letter Order, dated July 15, 2013 (Dkt. 32) for an Order, pursuant to Rule 23(d) of the Federal Rules of Civil Procedure, to compel and limit Defendant Durand Glass' and its counsel's pre-certification communications with putative class members as set forth in Plaintiffs' Motion and accompanying Brief in Support. Documents of the same are hereby served upon Defendant Durand Glass and counsel of record by way of this Court's Electronic Case Filing ("ECF") system.

Respectfully Submitted,

*s/Nicholas D. George*
Nicholas D. George, Esq.
Justin L. Swidler, Esq.
Richard S. Swartz, Esq.
**SWARTZ SWIDLER, LLC**

Dated: July 26, 2013

**ATTORNEYS FOR PLAINTIFFS**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CINDY BOBRYK, *et al.*<br><br>Plaintiffs,<br>v.<br><br>DURAND GLASS MANUFACTURING COMPANY, INC., *et al.*<br><br>Defendants. | CIVIL ACTION NO 1:12-05360 |

**PLAINTIFFS' MOTION TO COMPEL AND LIMIT DEFENDANT DURAND GLASS' AND ITS COUNSEL'S PRE-CERTIFICATION COMMUNICATIONS WITH PUTATIVE CLASS MEMBERS**

Plaintiffs Cindy Bobryk and others (hereafter "Plaintiffs"), by and through undersigned counsel, hereby move this Court for an Order, pursuant to Rule 23(d) of the Federal Rules of Civil Procedure, as a result of Defendant Durand Glass Manufacturing Company, Inc.'s (hereafter "Defendant's") and/or its counsel's improper and abusive *ex parte* communications related to this litigation with putative class members. As a result of such improper and abusive *ex parte* communications, putative class members have been misled and have executed twenty (20) declarations setting forth incorrect facts or beliefs known to be untrue by Defendant and Defendant's counsel. Plaintiff hereby moves this Court for an Order limiting Defendant and its counsel from engaging in further *ex parte* communications related to the litigation with putative class members prior to class certification of this matter absent a Court Order and prohibiting Defendant from using the declarations in any proceeding in this matter, including for purposes of impeachment. Plaintiffs further move this Court for an Order (as a remedial measure for the improper and abusive behavior engaged in by Defendant and further described herein) compelling Defendant and its counsel to (1) produce all notes from such *ex parte*

communications relating to the litigation with putative class members;  (2) identify all putative class members contacted by Defendant or Defendant's counsel for investigations or the solicitation of declarations (including the dates of such communications and the manner of contact); (3) produce all drafts of such declarations; (4) produce all writings shared with or reviewed by such putative class members in connection with such investigations; and (5) distribute a form letter (attached to Plaintiffs' Brief as Exhibit  C) to all putative class members to remediate any misunderstandings suffered as a result of the *ex parte* communications by Defendant and/or its counsel in connection with this matter.

In support of Plaintiffs' Motion, Plaintiff relies on the accompanying Brief in Support, the contents of which are incorporated herein by reference.

Respectfully Submitted,

*s/Nicholas D. George*
Nicholas D. George, Esq.
Justin L. Swidler, Esq.
Richard S. Swartz, Esq.
**SWARTZ SWIDLER, LLC**
1878 Marlton Pike East, Suite 10
Cherry Hill, NJ 08003
ngeorge@swartz-legal.com
Phone: (856) 685-7420
Fax: (856) 685-7417

Dated: July 26, 2013                    **ATTORNEYS FOR PLAINTIFFS**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CINDY BOBRYK, *et al.*<br><br>Plaintiffs,<br>v.<br><br>DURAND GLASS MANUFACTURING COMPANY, INC., *et al.*<br><br>Defendants. | CIVIL ACTION NO 1:12-05360 |

**ORDER**

**THIS MATTER** having been presented to the Court on the motion of Plaintiffs, Cindy Bobryk and others, for an Order to Compel and Limit Defendant Durand Glass' and its Counsel's Pre-Certification Communications with Putative Class Members, pursuant to Rule 23(d) of the Federal Rules of Civil Procedure, and this Court having considered the moving papers submitted in support thereof, and any papers submitted in opposition thereto, and for good cause shown,

IT IS this _________ day of __________________, 2013,

**ORDERED**, that Plaintiff's Motion is **GRANTED** in full; and it is further,

**ORDERED**, that Defendant Durand Glass and its counsel may not engage in further *ex parte* communications related to the litigation with putative class members prior to class certification of this matter absent a Court Order;

**ORDERED,** that Defendant may not use any of the declarations received by any putative class member, for any purpose in this litigation, including impeachment, where such declarations were provided as a result of *ex-parte* communications between Defendant's counsel and/or Defendant; and it is further,

**ORDERED**, that Defendant Durant Glass and its counsel are compelled to (1) produce all notes from such *ex parte* communications relating to the litigation with putative class members; (2) identify all putative class members contacted by Defendant or Defendant's counsel for investigations or the solicitation of declarations (including the dates of such communications and the manner of contact); (3) produce all drafts of such declarations (whether executed or not) shared with putative class members; (4) produce all other writings shared with or reviewed by such putative class members in connection with such investigations; and (5) distribute a form letter (attached to Plaintiffs' Brief as Exhibit C) to all putative class members to remediate any misunderstandings suffered as a result of the *ex parte* communications by Defendant and/or its counsel made to putative class members in connection with this matter.

BY THE COURT:

________________________________, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

CINDY BOBRYK, *et al.*

Plaintiffs,

v.

DURAND GLASS MANUFACTURING COMPANY, INC., *et al.*

Defendants.

CIVIL ACTION NO 1:12-05360

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION TO COMPEL AND LIMIT DEFENDANT DURAND GLASS' AND ITS COUNSEL'S PRE-CERTIFICATION COMMUNICATIONS WITH PUTATIVE CLASS MEMBERS**

Dated: July 26, 2013

Counsel: Nicholas George, Esq.
Justin L. Swidler, Esq.
Richard S. Swartz, Esq.

SWARTZ SWIDLER LLC
1878 Marlton Pike East. Ste. 10
Cherry Hill NJ, 08003
(856) 685-7420
Attorneys for Plaintiffs

## TABLE OF CONTENTS

I. Introduction ........................................ 1
II. Facts with Respect to the Declarations at Issue ........................................ 4
III. Legal Analysis. ........................................ 12
A. 23(d) authorizes the limitation of communications between parties with adverse interests and putative class members, even before class certification. ........................................ 12
B. Ethical considerations indicate that *ex parte* communications between putative class members and adverse parties are not proper. ........................................ 16
IV. The Declarations Indicate Abuse and Weigh in Need For the Proposed Order. ........................................ 18
V. Conclusion ........................................ 24

## TABLE OF AUTHORITIES

### Cases

Bell v. Beneficial Consumer Discount Co., 465 Pa. 225 (1975) ........................................ 18
Bower v. Bunker Hill Co., 689 F. Supp. 1032 E.D. Wash., 1985) ........................................ 13
Braun v. Wal-Mart Stores Inc., 60 Pa. D. & C 4th 13 (Ct. Com. Pl., Phila. Co., 2002).......... 18, 23
Dondore v. NGK Metals Corp., 152 F.Supp.2d 662 (E.D.Pa., 2001)........................................ 18, 23
Gulf Oil Co. v. Bernard, 452 U.S. 89 (1981)........................................ 14, 15, 16
Gutierrez, et al. v. Johnson & Johnson, No. 2:01-cv-5302 (DNJ) (Order of April 3, 2003, Dkt. 30, p. 5) ........................................ 19, 21
Hardware, Inc. v. Cotter & Co, Inc., 156 F.R.D. 630 (N.D. Tex. 1994) ........................................ 22
*In re* School Asbestos Litigation, 842 F. 2d 671 (3d Cir. 1988)........................................ 11, 16, 21
Kleiner v. First Nat'l Bank of Atlanta, 751 F.2d 1193 (11th Cir., 1985) .................... 13, 14, 15, 17
Loatman v. Summit Bank, 174 F.R.D. 592 (D.N.J., 1997) ........................................ 18
Mevorah v. Wells Fargo Home Mortg., Inc., 2005 U.S. Dist. LEXIS 28615 (N.D. Cal., 2005) 14, 17, 20, 25
Northern Acceptance Trust 1065 v. AMFAC, Inc. 51 F.R.D. 487 (D. Hawaii 1971).................. 12
*See* Abdallah v. The Coca-Cola Company, 186 F.R.D. 672 (N.D. Ga., 1999)................. 13, 14, 17
*See* Erhardt v. Prudential Group, Inc., 629 F.2d 843 (2d Cir. 1980) ........................................ 12
Weight Watchers of Philadelphia v. Weight Watchers Int'l, Inc., 53 F.R.D. 647, 651 (E.D.N.Y. 1971) ........................................ 12

### Statutes

29 U.S.C. § 216(b) ........................................ 1
Federal Rules of Civil Procedure, R. 23(d)........................................ 11, 24, 25

**Rules**

American Bar Association's Model Rules of Professional Conduct, 4.2 .................................... 25
Rules of Professional Conduct, 4.2 ......................................................................................... 25, 27

**Treatises**

MANUAL FOR COMPLEX LITIGATION (First), §1.41 ........................................................ 23
MANUAL FOR COMPLEX LITIGATION (Third), § 30.24................................................ 26, 31
MANUAL FOR COMPLEX LITIGATION, Fourth, §21.12..................................................... 22

[

# I. **Introduction**

Named Plaintiff Cindy Bobryk filed the instant matter on August 24, 2012, as an individual and collective action for unpaid overtime and wages under the Fair Labor Standards Act, and as an individual and class action for unpaid overtime and wages under the New Jersey Wage and Hour Law and the New Jersey Wage Payment Law. *See* Complaint (Dkt. 1). On May 16, 2013, Lashon Golden opted into the litigation pursuant to 29 U.S.C. § 216(b) of the FLSA (Dkt. 16). On June 4, 2013, Brendan Dunn opted into the litigation (Dkt. 17). On June 18, 2013, Cynthia Brownlow opted into the litigation (Dkt. 19). Plaintiffs (totaling four at this time) file this Brief in Support of their Motion to Compel and Limit Defendant Durand Glass' and Its Counsel's Pre-Certification Communications with Putative Class Members.

Plaintiffs' claims in the instant matter are simple and straightforward. Plaintiffs allege that Defendant Durand Glass Manufacturing Company, Inc. (hereafter "Defendant") failed to compensate them in accordance with the overtime provisions set forth in the Fair Labor Standards Act, the New Jersey Wage and Hour Law, and the New Jersey Wage Payment Law. Plaintiffs are current or former non-exempt production employees at Defendant's Millville, NJ, facility. Non-exempt production employees employed by Defendant routinely worked in excess of 40 hours per week, but were not compensated for pre-shift and post-shift duties that extended before and after, respectively, their shift start and end times. Such non exempt production employees significatly benefited their employer by performing essential, work-related tasks, without compensation.

Pre-shift duties included the donning of protective work equipment, collecting work materials and tools, receiving critical information or instructions from outgoing workers or other

co-workers relating to work to be performed during the day, and the performance of other required work-related tasks, without compensation.

Post-shift duties included remaining in the production location until shift-end, providing critical information to incoming workers, doffing PPE, returning equipment or materials, walking to the time-clock, and performing other required work-related tasks, without compensation.

Prior to the implementation of a "seven minute rule" (a work policy that required production employees to clock in and out no greater than seven minutes before and after the start and end, respectively, of their scheduled shift times), production employees clocked in and out upon the initiation and end of their work days. As a way to combat the potential liability of long stretches of time that non-exempt production employees were clocked in and working without payment, Defendant implemented the "seven minute rule."

Since the implementation of the "seven minute rule," production employees still clock in prior to their scheduled shift times for the performance of pre-shift duties, yet to avoid discipline or verbal warnings, such non-exempt employees must clock in no greater than seven minutes prior to the scheduled start time. To avoid discipline, production employees currently perform various pre-shift duties "off the clock." Likewise, to avoid a violation of the seven minute rule, various post-shift duties are performed "off-the-clock" as well, such as the returning of work equipment and removal of personal protective equipment.

Regardless, the performance of required pre-shift and post-shift duties compels the non-exempt production employees to work in excess of their scheduled shift times, generally forty hours per week (but in some cases more). Defendant's policies, therefore, cause non-exempt

production employees to be denied compensable work time performing pre and post-shift duties at the required overtime rate of pay.

In addition to the "seven minute rule," Defendant applies a uniform rounding policy that rounds an employee's time down to the scheduled start and end times regardless of whether an employee is clocked in and working in excess of that scheduled time. Defendant has argued that such a policy is "neutral" because an employee may clock in up to seven minutes "late"(after the scheduled start time) and up to seven minutes "early" (prior to the scheduled end time) and still be paid for one's scheduled shift without penalty. The policy is not neutral in effect, however, because employees are subject to discipline for clocking in four minutes "late." Moreover, the performance of required pre and post-shift tasks result in the non-exempt employees performing work duties in excess of their scheduled shift times. Thus, since the implementation of the "seven minute rule," the time that such non-exempt production employees are "clocked-in" still exceeds 40 hours per week on average (which is an illusory number, underestimating actual time worked) even though such employees are paid an hourly rate for their scheduled time only.

Despite Defendant's (and Defendant's counsel's) knowledge that, for years, Defendant implemented a uniform policy that caused all non-exempt employees to be denied payment for all such pre and post-shift time worked, Defendant and/or its counsel have gone to great lengths to avoid responsibility for such wage and hour violations. Egregiously, since the filing of this matter and in connection herewith, Defendant's counsel has obtained misleading declarations from putative class members by way of extensive *ex parte* communications with such individuals. To date, Defendant has successfully obtained twenty declarations from putative class members, all of which contained misleading statements contrary to applicable facts and law. Defendant's counsel's improper elicitation of statements, by way of *ex parte* inverviews,

from *putative class members with an interest in the litigation during the pre-certification stage without the presence of counsel* has deterred such individuals from participating in the lawsuit. Defendant's *ex parte* communications with putative class members were abusive because declarations drafted by counsel and presented to putative class members contained statements of purported "facts" which *were known to be untrue by counsel at the time*, or statements of mistaken "beliefs" *that went unrectified by counsel.* As a result of such unethical and abusive behavior, Plaintiffs must be afforded the remedies requested herewith.

## II. Facts with Respect to the Declarations at Issue

To obtain twenty declarations from putative class members, Defendant's counsel engaged in extensive *ex parte* communications with those individuals, who lacked the benefit of counsel in connection with such investigations against their own interest. *See* Defendant's Counsel's Letter to the Honorable Joel Scheider, dated July 12, 2013 (Dkt. 29), p. 2 (admitting that Defendant's counsel directly participated *ex parte* communications with Durand employees).[1]

All such declarations included the following statement:

> I have been informed that Cindy Bobryk contends in a lawsuit that she filed that Durand's employees were not paid properly. I also have been informed that Cindy Bobryk wants to proceed as a respresentative of other Durand employees, including me, to attempt to recover damages for alleged wage violations that she contends affect all employees in some fashion
>
> I spoke with Durand's attorney voluntarily and understand that Durand *will use the information* I provided to attempt to demonstrate that Cindy Bobryk's experiences were not

[1] While unclear from the record, presumably such communications occurred during work hours at Defendant's facilities. It is further unknown by Plaintiffs how many employees were contacted by Defendant or Defendant's counsel in connection with such interviews, the manner in which Defendant or Defendant's counsel solicited such interviews, and the number and identity of employees who declined to participate in such interviews.

> representative and, further, *that Durand has not violated any laws* regarding paying its employees. (Emphasis added).

*See* Defendant's July 12, 2013 Letter (Dkt. 29), p. 2. *See also* complete copies of all such 20 declarations, attached hereto as Exhibit A. As apparent from such boilerplate language, all such declarations were adverse to the interests of the putative class members. The declarants were requested by Defendant and/or its counsel to provide statements for the benefit of Defendant (their current employer) and without neutral advisement as to Plaintiffs' theory of the case. (Dkt. 29, p. 2). Moreover, as apparent from this boilerplate language contained in the 20 declarations, Plaintiffs' counsel was never identified to the declarants, nor were such putative class members advised as to their right to counsel *at any time* in connection with Defendant's counsel's *ex parte* investigations. *See* (Dkt. 29, p. 2), *see also* Ex. A.

All of the declarations indicate that the declarants performed pre and post-shift duties during their shifts.[2] *See* Decl. of Clarence Nichols, Durand 1111-12, Ex. A, ¶¶6-10 (donning PPE, walking from the time clock to the work station, receiving critical information or instructions relating to work to be performed); Decl. of James Pittman, Durand 1113-14, Ex. A, ¶¶7-10 (reporting to supervisor/receiving critical information, donning PPE, gathering tools); Decl. of Brian Rio, Durand1115-16, Ex. A ¶¶6-7 (donning and doffing, performing work duties prior to scheduled shift start time); Decl. of David Sutton, Durand 1117-19, Ex. A, ¶¶6, 9, 12-13 (donning and doffing, pre-shift meetings, receiving critical information from prior shiftworker/shift changeover, gathering tools, post-shift reporting/record keeping, maintenance issues); Decl. of Freddy Roig, Durand 1120-22, Ex. A, ¶¶8, 10-13 (donning and doffing,

[2] While some declarations only referenced the donning of PPE, by extension, such work duties would also include the doffing of PPE. The same would apply to gathering tools (because they must be returned), and shift change over meetings (because such meetings must also occur with the oncoming employee).

gathering tools, shift changeover, post-shift reporting/record keeping); Decl. of Thomas Swanson, Durand 1123-24, Ex. A, ¶¶ 5, 7, 9-11 (donning and doffing, powering up the computer, gathering tools, reporting to supervisor/receiving critical information); Decl. of John Wojculewski, Durand 1125-26, Ex. A, ¶¶5-8 (clocking in prior to scheduled start time, reporting to supervisor, donning and doffing, gathering tools); Decl. of Donald Schroder, Durand 1127-28, Ex. A, ¶¶7-10 (donning and doffing, receiving critical information as to work to be performed); Decl. of Felix Garcia, Durand 2662-63, Ex. A (arriving 20-25 minutes early, donning and doffing, gathering tools, shift changeover discussions); Decl. of Jeff Pierce, Durand 2664-65, Ex. A, ¶¶5, 7, 8, 12 (arriving 20-30 minutes early, gathering tools, donning and doffing, post-shift maintenance issues); Decl. of Shawn Hogan, Durand 2666-67, Ex. A, ¶¶5-9 (donning and doffing, receiving critical information as to work to be performed, gathering tools, pre-shift set-up and maintenence); Decl. of Rich Rydel, Durand 2668-2670, Ex. A, ¶¶4-7, 10 (clocking in seven minutes early, donning and doffing, checking the computer for critical information / work to be performed, discussions with outgoing employees, gathering tools, pre-shift maintenance duties, post-shift meetings); Decl. of Christopher Eldridge, Durand 2671-72, Ex. A, ¶¶4, 6, 7 (arriving 30-45 minutes early, donning and doffing, pre-shift changeover meeting); Decl. of Edgar Wolbert, Jr., Durand 2673-74, Ex. A, ¶¶4-7 (arriving half an hour early, donning and doffing, shift-changeover meeting); Decl. of Andrew Risley, Durand 2675-77, ¶¶5-11 (arriving half an hour prior to shift, donning and doffing, checking line-up, shift-changeover); Decl. of Roy Bower, Durand 2678-80, ¶¶5-8 (arriving 20-25 minutes prior to shift start, donning and doffing, clocking in seven minutes early, shift-changeovers, post-shift relief duties); Decl. of Quanda Peterson, Durand 2681-82, ¶¶4-9 (arriving 15-20 minutes prior to start time, reviewing day's work assignment, receiving directions from foreman as to work assignment, post-shift

relief duties, donning and doffing); Decl. of Dale Mason, Durand 2683-2684, ¶¶4-7 (arriving 15-20 minutes prior to start time, clocking in seven minutes early, pre-shift changeover discussions, donning and doffing); Decl. of William Seda, Durand 2685-87, ¶¶5-9 (donning and doffing, shift-changeover, post-shift relief duties); Decl. of Gerry Bricker, Durand 2688-89, ¶¶6-9 (arriving half an hour prior to start time, pre-shift meetings, gathering tools, shift-changeover meetings).

Without having been advised as to their legal rights, however, or to Plaintiffs' theory of the case, many of the declarants executed statements under oath that were factually incorrect or misleading.

At least 14 of the declarations reflected a mistaken statement or belief that the putative class members had not "worked" before or after the start of their shifts without being paid, were not entitled to overtime for such pre and post-shift duties, or that Defendant had "never" failed to pay overtime properly.  Decl. of Clarence Nichols, *supra*, ¶10 ("I am not aware of ever working before or after the start of my shift without getting paid."); Decl. of David Sutton, *supra*, ¶6 ("I have always been paid for all time and overtime I have worked . . . .");  Decl. of Freddy Roig, *supra*, ¶15 ("I do not believe that the Company failed to pay me for working before or after my shift."); Decl. of Thomas Swanson, *supra*, ¶12 ("I do not believe that I have worked any time in the last three years before the start of my shift or after the end of my shift for which I wasn't paid."); Decl. of John Wojculewski, *supra*, ¶10 ("I never worked overtime before or after my shift for which I do not get paid"); Decl. of Jeff Pierce, *supra*, ¶10 ("I do not believe that I have ever been denied overtime in the past three years.  I have been paid for all work I have performed before, during, or after my shift."); Decl. of Shawn Hogan, *supra*, ¶10 ("I believe that I have been paid properly for all the time that I have worked at Durand.  I have never had a problem

being properly paid for all overtime that I worked at Durand."); Decl. of Rich Rydel, *supra*, ¶11 (". . . I have been paid for all overtime that I worked."); Decl. of Christopher Eldridge, *supra*, ¶8 ("I believe that I have been paid properly for all the time that I have worked at Durand, including all overtime that I worked."); Decl. of Edgar Wolbert, Jr., *supra*, ¶7 ("I have always been paid appropriately for the overtime that I have worked at Durand."); Decl. of Andrew Risley, *supra*, ¶¶9, 11 ("I have never worked past my scheduled time and not been paid overtime for doing so …. I believe that I have been properly paid for all the time that I have worked at Durand, including all overtime that I worked."); Decl. of Roy Bower, *supra*, ¶7, 9 ("I believe that the extra minutes in these cases [of working five minutes after scheduled shift-end time] even out over the course of time given that I also sometimes clock out early and am nevertheless paid for my scheduled shift …. I believe that I was paid properly for all the time that I have worked at Durand, including all overtime that I worked."); Decl. of Quanda Peterson, *supra*, ¶8 ("When I do work overtime, I am paid properly for it."); Decl. of Dale Mason, *supra*, ¶9 ("I believe that I have been paid properly for all hours that I have worked at Durand, including overtime.").

Such declarations are rife with contradictions. For example, the declaration signed by Clarence Nichols incorrectly states a lack of awareness of "ever" working before or after a shift without getting paid. Nichols Decl., Durand 1111-12, Ex. A. The next two paragraphs belie that understanding:

> 11. On rare occasions, I may work 10 minutes past my shift performing odds and ends. No one has asked me to do this and I am not required to work past the end of my shift. I generally do not put in for overtime and am not required to work past my shift.
>
> 12. If I do work more than 15 minutes or more past my shift, I will submit an overtime slip.

Nichols Decl., Durand 1112, Ex. A, ¶¶11-12. Patently, the Declaration (presented to Mr. Nichols by Defendant's counsel *without* being offered the opportunity to communicate with Plaintiffs' counsel) presents opposing facts. Paragraph 11 indicated that Mr. Nichols performed post-shift duties without submitting for overtime and thus not being paid. Confoundingly, the declaraion also provides that he is "not aware of ever working before or after the start of" a shift without "getting paid." *Id.*, ¶11. Seemingly, Mr. Nichols was not informed that a person is legally working and must be paid for all time which an employer *permits* the employee to work, regardless of whether same is required. *See* 29 U.S.C. § 203(g).

Similar declarations confirmed the performance of various pre-shift duties that went unpaid, despite a mistaken "belief" that Defendant had not violated wage and hour laws:

> 8. In terms of equipment, I wear steel toed boots, safety glasses, and ear plugs. On occasion I wear chemical gloves or a face shield when I am doing welding which I put on and take off in the course of my work while clocked in.
>
> . . .
>
> 10. My typical work routine when I arrive at work is to go to the locker room and change my boots and put on my safety goggles.
>
> 11. I proceed to the maintenance shop after I clock in. At the maintenance shop I will pick up my tool cart if needed or sometimes I use a red toolbox.
>
> 12. After I clock in, first priority is to go to Line 22 and speak with the crew leader, Tony Lamateer to see if there are any problems on the Line.
>
> . . .
>
> 15. I do not believe that the Company failed to pay me for working before or after my scheduled shift.

Roig Decl., Durand 1121, Ex. A. Mr. Roig's lack of *belief* that the company violated overtime provisions corresponds with the other 13 putative class members who expressed similar incorrect sentiments. Such a widespread inconsistent understanding of Plaintiffs' theory of the case indicates the utter omission by Defense counsel, who is well versed in employment law, to explain the litigation in a neutral manner.

The declarations obtained at the behest of Defendant's counsel confirmed the performance of pre-shift duties:

> 6. I usually arrive at ***approximately 10 minutes before my shift. I walk into the building and clock in***.
>
> 7. If I arrive any earlier than 10 minutes, I will stay in my car in the employee parking lot.
>
> . . .
>
> 8. After I clock in, I put on my glasses and ear plugs and walk to my machine where I leave my gloves. I wear appropriate footwear as required by Durand, but I generally do not change my shoes or clothes at the plant.

*See* Wojculewski Decl., Durand 1125, Ex. A.

Nevertheless, the declarations provided by Defendant's counsel to putative class members dubiously attempted to refute the notion that Defendant improperly failed to pay overtime to such employees:

> 10. ***I never worked overtime before or after the start of my shift for which I do not get paid.***

*Id.*. (Emphasis added). Not only did the declarations indicate the performance of pre-shift and post-shift duties. The Declarations further indicated that the putative class members followed Defendant's "seven minute rule." *See* Sutton Decl., Durand 1118, Ex. A, ¶9 ("I do not clock in before 7 minutes before my scheduled time per company rules."); Risley Decl., Durand 2676,

Ex. A, ¶6 ("For the past year, I have not clocked in until seven minutes prior to my shift due to the rule that requires me not to clock in until seven minutes prior to my shift.").

The "seven minute rule" is Defendant's current policy that non-exempt production employees are not to clock in and out more than 7 minutes before and after, respectively, the start and end times of their shifts. *See* Defendant's Responses and Objections to Plaintiff's First Set of Requests for Admissions, Nos. 1 and 2 (admitting that the "seven minute rule" is applied to all non-exempt production employees), and Durand-724 (setting forth the "seven minute rule"), true and correct copies of which are attached hereto as Exhibit B.

Defendant's Responses to Admissions further provided that pursuant to Defendant's rounding policy, Defendant did not compensate employees for seven minutes of time worked ***prior to*** their scheduled shift start time, and for seven minutes of time worked ***after*** their scheduled shift end time, when such employees were clocked in. *See* Defendant's Response to Admissions, Nos. 3 and 5, Ex. B. Thus, Defendant and its counsel were well aware that unpaid time included such time that was "rounded down" every day due to the combined application of Defendant's seven minute rule and seven minute negative rounding policy.

In this respect, the statements prompted by Defendant's counsel that such putative class members always received or were never deneid overtime, *see* Sutton Decl., Durand 1118, Ex. A, ¶6, Wojculewski Decl., Durand 1125, Ex. A, ¶10, not only amounted to statement adverse to the putative class members' interests, such statements misled putative class members with respect to factual circumstances and their legal rights. Egregiously, these statements as presented in the declarations ***were known by Defendant's counsel to be untrue yet nevertheless were still presented to putative class members for signature under oath***.

## III. Legal Analysis.

### A. 23(d) authorizes the limitation of communications between parties with adverse interests and putative class members, even before class certification.

Federal Rule of Civil Procedure, R. 23(d), authorizes the Court to regulate communications with potential class members, even before class certification. *See* In re School Asbestos Litigation, 842 F. 2d 671 (3d Cir. 1988) ("Rule 23 specifically empowers district courts to issue order to prevent abuse of the class action process."). Courts should invoke such authority to prohibit a defendant's unauthorized precertification communications with potential class members. *See* Weight Watchers of Philadelphia v. Weight Watchers Int'l, Inc., 53 F.R.D. 647, 651 (E.D.N.Y. 1971) (district court's authority under rule 23(d) to control class litigation does not depend on prior class certification), *aff'd*, 455 F.2d 770 (2d Cir. 1972), 53 F.R.D. at 651 (district courts must control precertification communications to prevent counsel from engaging in race to complete questionable communications before certification).

Defendants' *ex parte* communications with putative class members constitute a challenge to the district court's ability to control the class litigation and undermine the proper functioning of the class action device. *See* Northern Acceptance Trust 1065 v. AMFAC, Inc. 51 F.R.D. 487, 491 (D. Hawaii 1971) (unauthorized efforts to obtain affidavits of noninterst violate spirit and letter of Rule 23).

For instance, *ex parte* communications with potential class members defeat the purpose and effectiveness of impartial class notice, impairing the district court's obligation to direct the "best notice practicable" and safegaurd potential class members from misleading communications. *See* Erhardt v. Prudential Group, Inc., 629 F.2d 843, 846 (2d Cir. 1980) (court has the responsibility to direct the "best notice practicable" to class members and to protect against unauthorized communications).

Moreover, such communications by defendants may deprive potential class members of their ability to make an unfettered, independent decision whether to remain in the class membership. *See* Abdallah v. The Coca-Cola Company, 186 F.R.D. 672, 678 (N.D. Ga., 1999) (holding that even in the absence of "any reason"[3] to suspect that [defendant Coca- Cola] will attempt to mislead its potential class member employees and coerce them into nonparticipation in the case,"simple reality suggests that the danger of coercion is real and justifies the imposition of limitations on Coca-Cola's communications with potential class members"); *see also* Kleiner v. First Nat'l Bank of Atlanta, 751 F.2d 1193, 1203 (11th Cir., 1985) ("[U]nsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without the opportunity for rebuttal. The damages from misstatements could well be *irreparable*.") (emphasis added); Bower v. Bunker Hill Co., 689 F. Supp. 1032, 1033 (E.D. Wash., 1985) (recognizing "extreme potential for prejudice to class members' rights" if defendant was permitted to discuss suit with class members). "Regardless of whether these communications occur before or after class certification, the effect is still the same . . . ." Abdallah, 186 F.R.D. at 679.

*Ex parte* communications between a defendant and potential class members who are its employees risk that such individuals forfeit their legal rights against a defendant without the benefit of an impartial explanation of the subject matter of the lawsuit provided by the class notice or of the class counsel's opinion of the merits of the class suit.[4] Kleiner, 751 F.2d at 1202

---

[3] Unlike the situation presented in Abdallah, this Court has ample reason to suspect that Defendant / Defendant's counsel actively misled employees / putative class members in connection with this case.

[4] While the 20 declarants have not waived legal claims against Defendant, *per se*, the factually untruthful statements solicited by Defendant with regard to certain declarants (such the statement in Mr. Wocjulewski's declaration that Defendant "never" failed to pay overtime) may eventually

(class members must receive impartial information about merits of class action in order to decide whether to remain in class membership); MANUAL FOR COMPLEX LITIGATION, Fourth, §21.12 ("Direct communications with class members . . . can lead to abuse."), *citing* Gulf Oil Co. v. Bernard, 452 U.S. 89, 101-102 (1981). "If the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent to the class may be coercive." Kleiner, 751 F.2d at 1203.

Prior to Gulf Oil[5] courts typically imposed broad pre-certification orders limiting communications by formal parties with absent class members. *See* MANUAL FOR COMPLEX LITIGATION (First), §1.41, at 47 n. 33 (1979 ed.) (district courts should exericse their power liberally to prevent abuse of class device by unapproved pre-trial communications). See Gulf Oil, 452 U.S. at 95 n. 5 (discussing the imposition by the district court of an order substantially based upon the form order set forth in the Manual for Complex Litigation (First), at App. §1.41).

The Court held that the policies underlying Rule 23 prohibited a blanket restriction on communications between *putative class members and representative parties. Id.* at 101, n. 15. Gulf Oil did not limit a court's ability to issue protective orders on communications between a

---

have the same effect. *See* Exhibit A. *See also* Mevorah v. Wells Fargo Home Mortg., Inc., 2005 U.S. Dist. LEXIS 28615, at 16 (N.D. Cal., 2005) (holding that the solicitation of declarations by an employer/defendant of employees who are putative class members goes beyond the arguably proper purpose of "disseminating information to its employees" and reflects an improper purpose because such signed declarations committed "employees who are potential class members to a set of facts that may be adverse to their interest and without their having been fully informed of all aspects of the case.")

[5] Gulf Oil held that the Eastern District of TX's order that banned *all communications* between the *representative plaintiffs and potential class members* was overbroad in part because it created at least potential difficulties for plaintiffs' efforts to "vindicate the legal rights of class employees" and "to inform potential class members of the existence of a lawsuit." 452 U.S. at 101.

defendant and putative class members who are current employees with adverse interests to that of the defendant.[6]

Thus, an order prohibiting a defendant from engaging in further direct *ex parte* communications with putative class members *in connection with the litigation prior to class certification* (such as the one Plaintiffs seek instantly) does not conflict with Gulf Oil. *See* In re School Asbestos Litigation, 842 F.2d 671, 682 (3d. Cir., 1988) (authorizing the imposition of a restricting order to guard against the "likelihood of serious abuse").[7] Contrary to Defendant's assertion that a "clear record of abuse" is "required" prior to issuing a Rule 23(d) order protecting putative class members from misleading or improper communications (*see* Defendant's letter to Hon. Joel Schneider, dated July 12, 2013, p. 2) (Dkt. 29), binding precedent holds to the contrary. See School Asbestos Litigation, 842 F.2d at 682.

---

[6] "Because of these potential problems, an order limiting communications between the parties and potential class members *should be* based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the right of the parties." *Id.* at 101-102 (emphasis added). Such language by the Supreme Court, however, was cautionary, as the Court did not rule on the issue of "what standards are mandated by the First Amendment." *Id.*, at 104, n. 15.

[7] In re School Asbestos Litigation involved class action litigation between public and private elementary schools nationwide against former manufacturers and suppliers of asbestos containing materials. *Id.* at 676. The corporate defendants organized and funded a trade organization named the Safe Building Aliance ("SBA"). *Id.* at 674. The SBA dissimeninated directly to class members a booklet, which purported to be neutral, but advanced "the position that removal of asbestos from buildings is not always necessary" without the presentation of contrary scientific evidence or the indication of the authors' involvement in the litigation. *Id.* at 681. Accordingly, the district court found such communications to be misleading, justifying an order pursuant to R. 23(d) imposing restrictions on further direct communications from the SBA to putative class members. *Id.* While the Third Circuit overturned the district court's order as oberbroad (as the order limited *all communications* made in any matter to any individuals or group "reasonably believed" to include class members), the Third Circuit nonetheless affirmed that the district court's authority to impose limits on the SBA's *direct communications* with class members. *Id* at 683-84.

Numerous Courts have held that there is the likelihood of abuse in a unilateral communications scheme when the class or putative class and defendant are in an ongoing business relationship. See Kleiner, supra, 751 F.2d at 1203 at 1203; Abdallah, supra, 186 F.R.D. at 678 (issuing a protective order "*even in absence of any reason to suspect*" that misleading communications or coercion would occur) (emphasis added); Mevorah v. Wells Fargo Home Mortg., Inc., 2005 U.S. Dist. LEXIS 28615 (N.D. Cal., 2005), at 18 (FLSA) ((1) restricting further pre-certification communications without pre-approval from the court; (2) ordering that the identity of all employees contacted for interviews be disclosed; (3) ordering defendant to bear the cost of distribution of a notice and questionnaire to correct misleading communications and declarations prepared by defendant and signed by potential class members; and (4) permitting Plaintiff to depose *any* individual contacted by defendant for interview with respect to those communications).

**B. Ethical considerations indicate that *ex parte* communications between putative class members and adverse parties are not proper.**

Moreover, it is ethically improper for an adverse party to engage in *ex parte* communications with putative class members in an effort to obtain statements adverse to those putative class members' interests.

The relevant Rule of Professional Conduct as adopted by the New Jersey Supreme Court is RPC 4.2 which provides:

> In representing a client, a lawyer ***shall not*** communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter . . . unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

RPC 4.2 is substantially identical to Rule 4.2 of the American Bar Association's Model Rules of Professional Conduct. Several courts have invoked MR 4.2 to prevent defense contacts with class members pre-certification. *See* Dondore v. NGK Metals Corp., 152 F.Supp.2d 662, 665-66 (E.D.Pa., 2001), (Bartle, J.) (invoking Pennsylvania's identical Rule Prof'l Conduct, R. 4.2 to reject a request by defense counsel to interview putative class members pre-certification because "the mere initiation of a class action extends certain protections to potential class members . . ."); Braun v. Wal-Mart Stores Inc., 60 Pa. D. & C 4th 13, *2 (Ct. Com. Pl., Phila. Co., 2002) (applying Rule 4.2 to restrict communications between an adverse party and putative class members); Bell v. Beneficial Consumer Discount Co., 465 Pa. 225, 229 (1975) (holding that putative class members are "properly characterized as parties to the action"). *See also* Loatman v. Summit Bank, 174 F.R.D. 592, 609 (D.N.J., 1997) (holding that defendant acted for an oppressive purpose and in bad faith when it improperly contacted plaintiff in an attempt to extract a settlement agreement from her in a manner *calculated to undermine the attorney-client relationship and her relationship to absent members of the putative class*) (emphasis added).

Putative class members in the least hold a "hybrid status" and cannot simply be treated as "unrepresented parties" for purposes of a Rule 23 class litigation. *See* Gutierrez, et al. v. Johnson & Johnson, No. 2:01-cv-5302 (DNJ) (Order of April 3, 2003, Dkt. 30, p. 5) (extending certain rights to putative class members *prior to* receiving communications from a party with adverse interests, including the identification of representative counsel),[8] *citing* Manual For Complex

---

[8] While Special Master, Hon. Nicholas H. Politan, declined to follow Judge Bartle's reasoning in Dondore, *supra*, that putative class members should be treated as parties to the action, such individuals were nevertheless afforded certain protections prior to class certification. ("Common sense dictates that in order to protect these rights, the putative members be informed of the existence of the law suit and the ***identity of the attorneys for the plaintiffs, as well as the fact that it is a class action***, and that ***they may be part of the class***.") (emphasis added). ***"[I]dentifying class counsel is an important facet in complete disclosure to putative class***

Litigation (Third), § 30.24 ("Although no *formal* attorney-client relationship exists between class counsel and the putative members of the class prior to class certification, there is *at least* an incipient fiduciary relationship between class counsel and the class he or she is seeking to represent.") (emphasis added), *citing* Newberg on Class Actions (3d ed. 1992 and 1994 Supp.), §15.14 (some courts have stated that a *constructive attorney-client relationship exists* between putative class members and class counsel prior to certification) (emphasis added), Thomas A. Dickerson, Class Actions: The Law of 50 States § 4.06[2] (1994) ("members of the purported class . . . are deemed represented by counsel for the class representatives *as of the time the complaint is filed with the court*.") (emphasis added).

## IV. **The Declarations Indicate Abuse and Weigh in Need For the Proposed Order.**

That serious abuse has occurred is evident by a review of the Declarations themselves. Defendant's counsel was able to elicit misleading statements from various putative class members (including statements from individual putative class members that such individuals "never" worked overtime that was not paid, or "have always been paid overtime"). Such statements were prepared by Defendant's counsel and presented to potential class members for signature, even though, when considering the facts contained in the declarations and Defendant's prior admissions, the declarations signed by putative class members were misleading and known by counsel to be false.

Thus, the *ex parte* communications between Defendant's counsel and putative class members were not simply investigative or to disseminate information, but were initiated for the improper purpose of obtaining signed declarations binding "potential class members to a set of

---

***members***. Without such a disclosure, employees who wish to retain an attorney prior to or rather than participating in interviews . . . may not know where to turn." Id., p. 7.

facts" adverse to their interests. *See* Mevorah, 2005 U.S. Dist. LEXIS 28615, at 16 (discussed *infra*, at n. 3). Moreover, Defendant counsel's ability to obtain statements known by such counsel to be patently untrue evinces actual abuse.

Defendant counsel's abusive behavior was further compounded by the failure to adhere to ethical standards limiting communications with adverse parties of interest in class litigation. Defendant never sought Plaintiffs' authorization or the Court's authorization to engage in such communications (as required per RPC 4.2). Moreover, Defendant failed to provide the declarants *at minimum*, the (1) contact information of Plaintiffs' counsel, (2) the right to speak with counsel prior to such interviews, (3) a disclosure that they may be part of the class, and (4) the existence of a lawsuit *related to failure to pay overtime. See, e.g.*, Ex. A; *see also* Gutierrez, No. 2:01-cv-5302 (DNJ) (Dkt. 30, p. 5) (discussed *infra* at note 7).

It is not simply what is disclosed by an adverse party, but also what is not disclosed that may make a communication misleading in the class action context, justifying a protective order under 23(d). *See* School Asbestos Litigation, 842 F.2d at 683 (3d. Cir., 1988) (holding that the failure to identify the certain interested parties in the asbestos removal litgiation as those responsible for the dissemination of a brochure to putative class members created the likelihood of abuse justifying a limited protective order in connection with such communications).

The three sentence biolerplate language appearing in every declaration elicited by Defendant's counsel evidences abuse in part for what was not disclosed therein by Defendant's counsel:

> (1) I have been informed that Cindy Bobryk contends in a lawsuit that she filed that Durand's employees were not paid properly.
>
> (2) I also have been informed that Cindy Bobryk wants to proceed as a respresentative of other Durand employees, including me, to

> attempt to recover damages for alleged wage violations that she contends affect all employees in some fashion
>
> (3) I spoke with Durand's attorney voluntarily and understand that Durand will use the information I provided to attempt to demonstrate that Cindy Bobryk's experiences were not representative and, further, that Durand has not violated any laws regarding paying its employees.

*See* Exhibits A. Such statements are misleading in part due to the information omitted (in addition to the misleading information included). Sentence one identifies Named Plaintiff specifically, in connection with a suit "she filed,"[9] that Defendant's employees were not "paid properly." Notably omitted is that Named Plaintiff filed the suit as a collective action (under the FLSA) and class action *on behalf of* Defendant's employees (distinguished from a lawsuit that "she filed"). Moreover, the statement that the lawsuit contends that "Durand's employees were not paid properly" is also rife for misinterpretation because it fails to communicate the essence of the lawsuit –the recovery of unpaid *overtime* for the performance of mandated pre and post-shift duties.

Sentence two notably states that Ms. Bobryk "wants to proceed as a representative of Durand employees . . . ." Again, there is neither mention that the lawsuit was filed as a collective action under the FLSA and a class action *on behalf of others* under Rule 23, nor is there any explanation as to a Named Plaintiff's fiduciary obligations to putative class members.

[9] Ms. Bobryk's employment was terminated by Defendant weeks prior to the filing of the Complaint, *see* Complaint (Dkt. 1), p. 6. Therefore even the initial framing of the lawsuit by Defendant's counsel as a personal lawsuit between Ms. Bobryk and Defendant "is rife with the potential for confusion . . . given [defendant's] interest in the suit." *See, e.g.,* Hampton Hardware, Inc. v. Cotter & Co, Inc., 156 F.R.D. 630, 634 (N.D. Tex. 1994). When faced with an investigation initiated by Defendant's counsel, the mere association with Ms. Bobryk (an employee terminated less than a month prior to the filing of the lawsuit), chills a putative class member's desire to be associated with Ms. Bobryk (*ergo*, the litigation) out of fear of potential reprisal.

While the statement as to Ms. Bobryk's "wants" is not false, *per se*, the statement provides no explanation as to the legal significance of the matter proceeding as a class action. Notably omitted is a statement indicating that, if successful, *the declarant* (and not simply Ms. Bobryk) may be entitled to legal (including monetary) relief. This Court cannot simply assume, as Defendant has,[10] that putative class members understand sophisticated legal concepts of class representation and class certification without the benefit of advice from counsel. *See* Dondore, 152 F.Supp. 2d. at 666 ("[T]he benefits of class action litigation could be seriously undermined" if "unsophisticated" class members were interviewed without their counsel present.").

Sentence three's language (presumably included by Defendant's counsel as a feeble attempt to evince that the declarations made under oath were non-obligatory) provides no such comfort. Omitted from sentence three is any mention or indication that the declarant understands the potential negative implications as to that individual's rights in connection with executing a statement (under oath) prepared by an adverse party. Also omitted from such declarations was any mention of non-retaliation for participation in, or being represented in, the lawsuit. Nor is there a provision that no awards or positive treatment will result from providing a declaration.

Moreover, the natural implication of executing a statement that will assist one's employer to prove "that Durand has not violated any laws regarding paying its employees" is that the statement serves as a boon to the employer. Implicitly, by benefiting the employer, the putative class member's standing with the employer improves as well. Faced with the choice as presented by Defendant's counsel of assisting one's employer, or siding with a "rogue" former employee who was fired and whose counsel is nowhere in sight, the conflict is intractable even for putative class members who wish to remain silent on the matter. *See* Braun v. Walmart

[10] For example, Defendant's counsel has argued that such *ex parte* interviews and communications with putative class members were "entirely appropriate" (*see* Dkt., 29, p.2).

Stores Inc., 60 Pa. D & C 4th, at *2 ("[I]t would be hard to find a more challenging conflict for a current employee to be placed in than to be interviewed by counsel for their current employer concering allegations about work places abuses.").

In this sense, not only those who participated in such interviews have been chilled from participating in the litigation. The context of such interviews is telling. Such interviews were conducted by Defendant's counsel, presumably during work hours at Defendant's facilities, to assist in the defense of the action. An unknown number of putative class members were solicited directly by Defendant or Defendant's counsel. The specter of the lawsuit has therefore spread throughout the facility, by word of mouth or otherwise, potentially rife with misunderstandings and inhibiting this Court's ability "to protect class members and fairly conduct the action." Fed. R. Civ. P. 23(d)(1)(B). Accordingly, the need for judicial intervention weighs in favor of Plaintiffs' request given the abusive and improper behavior conducted by Defendant and its counsel in the Rule 23 context.

Defendant and its counsel should therefore be prohibited from engaging in further direct *ex parte* communications with putative class members related to this litigation prior to class certification absent a court order.[11] Defendant should further be prohibited from using the

---

[11] Such a limitation is no more restrictive than necessary because it relates to communications only with respect to the litigation, does not affect communications with respect to daily business operations, is limited in time to the period of class certification, and does not limit Defendant's ability to prepare for the litigation or motion practice. Defendant's counsel remains free to discuss and investigate the litigation with non-exempt managerial employees who oversee such putative class members and non-production employees generally (such staff members responsible for implementing Defendant's wage policies and practices. *See* MANUAL (Third), §30.24 at 233 (protective orders in the Rule 23 context should be carefully drawn in a manner that limits speech as little as possible, consistent with the rights of the parties).

declarations in these proceedings for any purpose, including the purpose of impeachment.[12] This Court should further compel Defendant to (1) produce all notes from *ex parte* communications;[13] (2) identify all putative class members contacted by Defendant or Defendant's counsel for investigations or the solicitation of declarations (including the dates of such communications and the manner of contact); (3) produce all drafts of declarations; (4) produce all writings shared with or reviewed by such putative class members in connection with such investigations; and (5) distribute the form letter (attached as Exhibit C) to all putative class members to remediate any misunderstandings in connection with this matter as a result of the *ex parte* communications by Defendant and/or its counsel.[14]

[12] Such a limitation does not prejudice Defendant. Defendant remains free to depose such individuals, in a non *ex-parte* fashion, and to gather the information which Defendant believes is necessary to defend this case. This limitation, however, will permit putative class members who may have misunderstood their rights to not be prejudiced by Defendant's questionable conduct, and will further ensure that Defendant does not benefit from such inappropriate communications.

[13] Despite Defendant's assertion that there is no basis for "invading the work product privilege," (Dkt. 29, p. 3), Plaintiffs have demonstrated a "substantial need" for such materials and cannot obtain their substantial equivalent by other means. *See* Fed. R. Civ. P. 26(b)(3)(A)(ii). Without the same, Plaintiffs cannot repudiate the abuse or factual misrepresentations caused by Defendant's improper *ex parte* communications (demonstrating substantial need). Plaintiffs cannot obtain the "substantial equivalent" because Plaintiffs were not present for such communications. Moreover, because of the inherently conflicted position that such putative class members were placed in by Defendant and its counsel, there is "no substantial equivalent by other means" that will present the content of what was communicated to putative class members in securing such unreliable declarations.

[14] See Mevorah, 2005 U.S. Dist. LEXIS 28615, at 18 (ordering a similar restriction on further pre-certification communications, and compelling defendant to produce a complete list of the identity of all putative class members contacted for interviews and to distribute a notice at defendant's cost to all putative class members to remediate misleading and improper pre-certification communications engaged in by defendant with putative class member employees).

## V. Conclusion

For the foregoing reasons, Plaintiffs' motion should be granted. Alternatively, if this Court finds that there is not a sufficient record to issue such an order, Plaintiffs' respectfully request an evidentiary hearing in connection with such *ex parte* communications.

Respectfully Submitted,

*s/Nicholas D. George*
Nicholas D. George, Esq.
Justin L. Swidler, Esq.
Richard S. Swartz, Esq.
**SWARTZ SWIDLER, LLC**
1878 Marlton Pike East, Suite 10
Cherry Hill, NJ 08003
ngeorge@swartz-legal.com
Phone: (856) 685-7420
Fax: (856) 685-7417

Dated: July 26, 2013

**ATTORNEYS FOR PLAINTIFFS**