# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

CINDY BOBRYK, et al.          :

                                    :

                                    :

         v.                     :     No. 1-12-cv-05360

                                    :

                                    :

DURAND GLASS MANUFACTURING  :
COMPANY, INC., et al.            :

----------------------------------------------------------------------------------------------------

## DEFENDANT'S BRIEF IN OPPOSITION TO MOTION
## FOR CLASS CERTIFICATION

----------------------------------------------------------------------------------------------------

Thomas J. Barton, Esq.
Daniel H. Aiken, Esq.
**DRINKER BIDDLE & REATH LLP**
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996
Tel: (215) 988-2700
Fax: (215) 988-2757

*Counsel for Defendant Durand Glass
Manufacturing Company, Inc.*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................. 1

II.   BACKGROUND .................................................................................................. 2

    A.    Durand's Operations and Its Workforce ................................................. 2

    B.    Durand's Clock-in/Clock-out Restriction and Seven-Minute Grace Period.......... 4

    1.    Restriction Against Clocking In Early or Clocking Out Late ................................ 4

    2.    Seven-Minute Grace Period and Rounding ........................................ 7

    C.    Time Clock Habits of Durand Employees Vary from Employee to Employee ........................................................................................ 9

    D.    Durand Employees' Use of PPE Varies by Position ........................................... 10

    E.    Uniforms and Other Clothing or Equipment ....................................... 12

III.  ARGUMENT ................................................................................................... 14

    A.    Standard Applicable to a Motion for Class Certification ....................................... 14

    B.    Rule 23 Requirements ................................................................... 16

    C.    Plaintiffs Cannot Identify An Ascertainable Class Based on Objective Criteria. .............................................................................. 17

    1.    There Is No Uniform Policy or Practice Requiring Pre or Post Shift Duties Across the Class ......................................................... 17

    2.    Durand's Grace Period/Rounding Policy Is Lawful and Plaintiffs Do Not Identify an Ascertainable Class Related to this Policy ......................... 21

    3.    Plaintiffs Have Not Identified An Ascertainable Class With Respect to Durand's Previous Time Keeping System ....................................... 25

    4.    Exploration of the De Minimis Doctrine with Respect to Each Employee Also Counsels Against Finding an Ascertainable Class ..................................... 26

    D.    Certification Under Rule 23(b)(3) Would Be Inappropriate ..................................... 29

        1.    Individual Issues Predominate ................................................. 30

        2.    Common Evidence Cannot Prove Potential Class Members' Claims. ................................................................. 30

        3.    Individualized Damages Questions Will Also Predominate .................... 32

        4.    A Class Action Is Not Superior ............................................... 34

    E.    Plaintiffs Have Not Proven That The Rule 23(a) Requirements Are Satisfied................................................................................ 34

        1.    Plaintiffs Cannot Prove Numerosity ......................................... 34

        2.    There Are No Common Answers To Crucial Questions ........................ 35

## TABLE OF CONTENTS
(continued)

**Page**

|  |  | 3. | Plaintiffs Cannot Prove Typicality Or Adequacy | 36 |
|---|---|---|---|---|
|  | F. |  | Plaintiffs Cannot Meet Their Burden For Conditional Certification of the Collective Action Under the FLSA | 37 |
| IV. |  |  | CONCLUSION | 39 |

PHLIT/ 2213413.4

# TABLE OF AUTHORITIES

**CASES**                                                                            **Page(s)**

Abbe v. City of San Diego,
    No. 05cv1629, 2007 WL 4146696 (S.D. Cal. Nov. 9, 2007) ............................................ 28-29

Adair v. Wis. Bell, Inc.,
    No. 08-C-280, 2008 WL 4224360 (E.D. Wis. Sept. 11, 2008)................................................18

Adami v. Cardo Windows, Inc.,
    No. 12-2804 (JBS/JS), 2014 WL 320048 (D.N.J. Jan. 29, 2014)....................................15, 21

Agostino v. Quest Diagnostics, Inc.,
    256 F.R.D. 437 (D.N.J. 2009)..........................................................................................16

Alvarado v. Costco Wholesale Corp.,
    No. C 06-04015 JSW, 2008 WL 2477393 (N.D. Cal. June 18, 2008)..............................27, 28

Anderson v. Mt. Clemens Pottery Co.,
    328 U.S. 680 (1946)........................................................................................................27

Bernard v. Household Int'l, Inc.,
    231 F. Supp. 2d 433 (E.D. Va. 2002) .................................................................................38

Briggins v. Elwood TRI, Inc.,
    882 F. Supp. 2d 1256 (N.D. Ala. 2012)............................................................. 25, 26-27, 30

Busk v. Integrity Staffing Solutions, Inc.,
    713 F.3d 525 (9th Cir. 2013) ......................................................................................27, 28

Cannon v. Vineland Hous. Auth.,
    627 F. Supp. 2d 171 (D.N.J. 2008) ....................................................................................14

Comcast v. Behrend,
    133 S. Ct. 1426 (2013)................................................................................................31, 33

Contini v. United Trophy Mfg., Inc.,
    No. 6:06-CV-432-ORL-18UA, 2007 WL 1696030 (M.D. Fla. June 12, 2007) .....................18

Cowden v. Parker & Assocs.,
    No. 5:09-323, 2013 U.S. Dist. LEXIS 72253 (E.D. Ky. May 22, 2013)................................33

De Asencio v. Tyson Foods,
    500 F.3d 361 (3d Cir. 2007)..............................................................................................22

East v. Bullock's, Inc.,
    34 F. Supp. 2d 1176 (D. Ariz. 1998) .................................................................................18

# TABLE OF AUTHORITIES
(continued)

**Page**

Farris v. County of Riverside,
    667 F. Supp. 2d 1151 (C.D. Cal. 2009) ..................................................27, 28

Forman v. Data Transfer,
    164 F.R.D. 400 (E.D. Pa. 1995) ...........................................................16

Freeman v. Wal-Mart Stores, Inc.,
    256 F.Supp.2d 941 (W.D. Ark. 2003) ......................................................38

Gillings v. Time Warner Cable LLC,
    No. 10-5565-AG(RNBx), 2012 WL 1656937 (C.D. Cal. Mar. 26, 2012) .......................27, 28

Hassine v. Jeffes,
    846 F.2d 169 (3d Cir. 1988) ..............................................................37

Hayes v. Wal–Mart Stores, Inc.,
    725 F.3d 349 (3d Cir. 2013) ..............................................................15

Hinojos v. Home Depot,
    No. 2:06-cv-00108, 2006 WL 3712944 (D. Nev. Dec. 1, 2006) ..............................38

In re Hydrogen Peroxide Antitrust Litig.,
    552 F.3d 305 (3d Cir. 2008) ...........................................................30-31

Johnson v. GEICO Cas. Co.,
    673 F. Supp. 2d 255 (D. Del. 2009) ......................................................16

Lindow v. United States,
    738 F.2d 1057 (9th Cir. 1984) ..........................................................27, 28

Marcus v. BMW of N. Am., LLC,
    687 F.3d 583 (3d Cir. 2012) .......................................................15, 16, 35

In re Merck & Co., Sec. Derivative & ERISA Litig.,
    MDL No. 1658, 2013 U.S. Dist. LEXIS 13511 (D.N.J. Jan. 30, 2013) ....................16, 36

Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
    259 F.3d 154 (3d Cir. 2001) .......................................................15, 34

Parra v. Bashas', Inc.,
    No. 02-0591, 2013 U.S. Dist. LEXIS 76792 (D. Ariz. May 31, 2013) ....................33

Pfohl v. Farmers Ins. Grp.,
    No. CV03-3080, 2004 WL 554834 (C.D. Cal. Mar. 1, 2004) .............................38

- iv -

## TABLE OF AUTHORITIES
(continued)

**Page**

Ray v. Motel 6 Operating, L.P.,
No. 3-95-829, 1996 WL 938231 (D. Minn. Mar. 18, 1996) ...................................38

Roach v. T.L. Cannon Corp.,
No. 3:10-cv-0591, 2013 U.S. Dist. LEXIS 45373 (N.D.N.Y Mar. 29, 2013) ........................33

Rutti v. Lojack Corp., Inc.,
596 F.3d 1046 (9th Cir. 2010) ..............................................................................28

In re Schering Plough Corp. ERISA Litig.,
589 F.3d 585 (3d Cir. 2009) ..................................................................................37

Sherman v. Am. Eagle Exp., Inc.,
No. 09-575, 2012 WL 748400 (E.D. Pa. Mar. 8, 2012) .........................................15

Smith v. T-Mobile USA, Inc.,
No. CV 05-5274, 2007 WL 2385131 (C.D. Cal. Aug. 15, 2007)....................30, 38

Tracy v. NVR, Inc.,
No. 04-CV-6541L, 2013 U.S. Dist. LEXIS 62407 (W.D.N.Y. Apr. 29, 2013)......................33

Troester v. Starbucks Corp.,
No. CV 12-7677, 2014 WL 1004098 (C.D. Cal. Mar 7, 2014) ..............................27

Wal-Mart Stores v. Dukes,
131 S. Ct. 2541 (2011)..................................................................14, 16, 17, 36

**STATUTES, RULES & REGULATIONS**

Fed. R. Civ. P. 23 .......................................................................................... *passim*

29 C.F.R. § 785.48..............................................................................17, 18, 25

**OTHER AUTHORITIES**

N.J.A.C. § 12:56-5.8 .............................................................................................14

## I.     INTRODUCTION

Named Plaintiff Cindy Bobryk has not demonstrated the significant requirements for class certification under F.R.C.P. Rule 23(b)(3). Discovery has shown that Ms. Bobryk's alleged pre shift and post shift duties and alleged damages are based on her specialized activities as a Cold End Electro mechanic in the Maintenance department which included: maintenance of production equipment; preparation of computer generated work orders and forms; the use, transport and storage of a tool box; alleged shift handoff activities and reporting to a work station away from the production line. As such, her claims and damages and those of the other putative class members are highly individualized. Durand's workforce consists of a diverse workforce performing varied tasks across one hundred different positions in at least fifteen different departments. Ms. Bobryk cannot show that she shares anything in common with the alleged class other than the fact that she wears earplugs and safety glasses and works in the same facility. That is where any similarity ends. With a few exceptions, Durand's hourly work force can walk into the plant from the parking lot and report for their shift, without being required to perform any tasks at all. Although Plaintiffs exaggerate the required PPE for Durand's employees, 62% of Durand's workforce wears only safety glasses and ear plugs, which take less than ten seconds to put on. Uniforms are not required at all, and any specialized gear is used on an as-needed basis during employees' shift; it is not "donned" prior to the shift. And, more important, there is simply no evidence that Durand has failed to properly pay its workforce, especially not on a classwide basis.

In an attempt to draw out a similarity between herself and the other workers, she alleges that all employees were subject to the same timekeeping policies. However, all hourly employees in any facility are typically subject to the same timekeeping policies. The question is not, "what are the timekeeping policies?"; but "what are the employees' pre shift and post shift

activities, and do they involve predominately common factual and legal issues and proof of damages?" Here, proof of the alleged class claims would require individualized factual proof as to the duties of each position and the and pre and post shift habits of each individual employee, which in turn would devolve into a series of mini-trials on liability.

Further, there is no policy, or collection of policies that uniformly, negatively impacts Durand's workforce, or an identifiable segment of that workforce. Rather, Durand's seven-minute grace period and rounding policy is lawful, both in design and implementation, as the policy is used in a neutral manner that will not result in a failure to pay for compensable time. In their brief, Plaintiffs offer a pseudo-statistical analysis of three weeks of time punches and claim that this analysis proves that Durand's policy is unlawful. As demonstrated below, a review of employee time records shows that Durand's policy is neutral in both design and implementation. Moreover, Plaintiffs have not adduced evidence, beyond Ms. Bobryk's own anecdotes, of class wide pre and post shift work performed by employees for which they were not compensated. Thus, Plaintiffs have not adduced evidence of a violation of the law that stretches beyond Ms. Bobryk's own claims.

In addition to a lack of evidence to support class certification under Rule 23 (b)(3), for the same reasons, Plaintiff cannot maintain an "opt-in" collective action under the FLSA because she has not presented even minimal evidence that she is similarly situated to the class she seeks to represent.

## II.   BACKGROUND

### A.   Durand's Operations and Its Workforce

At its plant in Millville, New Jersey, Durand manufactures various types of glass products, including drinking glasses sold by retail stores such as Costco, and candle jars, such as those used by Yankee Candle. Durand's plant is set up in various production segments. The

- 2 -

"Hot End" is where Durand runs its machine forming equipment used to make glass, as well as several other specialized manufacturing machines. The "Cold End" is where Durand performs post-production activities, such as packing, decorating, quality control, etc.

Durand currently employees about 580 employees in 100 different positions. (Ojeda Decl. at ¶ 2). There are thirteen different departments that perform distinct tasks within the production cycle. Each department is managed by a different supervisor. Attached as Exhibit A is a list of the various positions and departments within Durand, and the number of employees in each position. The ten positions with the greatest number of employees at Durand are Cold End Packers (112), Hot End Operators (56), Operator Trainees (19), Production Set up (22), Forklift Driver (24), Packing Line Technician (19), Job Change Mechanic (18), QC Inspectors (16), Warehouseman Days and Shift (25), and Chief Operator (16). (Ojeda Decl. at Ex. 1). The remaining 90 positions have fifteen employees or less in them, including Ms. Bobryk's position of Cold-End Electromechanic, which currently has 5 employees, plus Ms. Bobryk who was terminated on August 12, 2012, for sleeping on the job. About forty of these positions work strictly day shifts, with no rotating shift. (Aiken Decl. at Exhibit 11). The rest work a continuous rotating shift.

Employees working in the Packer and Operator positions (168 employees total) operate and work with machines that are continuously running. (Ojeda Tr. at 148:19 to 149:10). Each Operator is assigned to one piece of equipment, so they do not begin working on the machines until they relieve the Operator on the shift before them. (Ojeda Tr. at 149:11-15). Some Operators have a brief discussion at the changeover, when both employees are still clocked in. The evidence in the record shows that this conversation lasts no more than three minutes, but often less. Some Operators do not have any such discussion. Some Packers reported having a

- 3 -

very brief (1-2 minutes) exchange with the person they were relieving, but some did not. (Brownlow Tr. at 47:15 to 48:2). Packers do not use any tools. (Brownlow Tr. 48:21-23; Ojeda Tr. at 147:3-6) Operators keep their tools at their assigned machine, and, thus, do not need to gather them prior to they begin their shift. (Ojeda Tr. at 150:10-18)

### B.   Durand's Clock-in/Clock-out Restriction and Seven-Minute Grace Period

1.    *Restriction Against Clocking In Early or Clocking Out Late*

Beginning in April 2011, Durand instituted a time punch policy that required employees to clock in no earlier than seven minutes before their scheduled shift and to clock out no later than seven minutes after their scheduled shift. The purpose of this policy was to address a long-held practice of Durand's workforce of clocking in well before their scheduled shift time, and then waiting, without doing work, for their shift to start. For example, many employees would arrive to work about one-half hour before their scheduled shift time, clock in right away, then go to the cafeteria to eat and socialize, or go outside to smoke, while they waited to relieve the crew on the previous shift, or to begin their shift.

One of the catalysts for this practice was Durand's full service cafeteria, where employees could get a full, hot breakfast (for example), prior to their shift. Although the cafeteria has since been replaced by vending machines, employees continued—and continue to this day—to arrive to the plant well in advance of their scheduled shift in order to ease into their shift, drink coffee, smoke cigarettes, and socialize. (Ojeda Tr. 155:6-22; Brownlow Tr. at 21:6 to 22:4; Decl. of Andrew Risley ¶¶ 5 & 6 ("I typically arrive about thirty minutes prior to my scheduled shift . . . I prefer to arrive early because I do not like to rush into my shift."); Decl. of Dale Mason ¶ 4 ("When I am on day shift, I usually arrive to the plant about 15-20 minutes before my shift is scheduled to begin . . . . Prior to clocking in, I sit in the break room, relax, and go outside to smoke cigarettes."); Decl. of William Seda ¶ 5 ("When my shift starts at 8:00 am, I

- 4 -

usually arrive . . . around 6:30 or 7:00 in the morning, though I do not punch in until seven minutes before my shift.  Prior to punching in, I drink coffee, smoke cigarettes, and hang out in the breakroom.  I consider this my own personal time."); Decl. of Edgar Wolbert ¶ 4 ("I typically arrive about one-half hour before my shift is scheduled to start, but I do not clock in until seven minutes before my shift is scheduled to start.  Prior to clocking in, I go to the locker room and put on my boots, I get my tool bag, and I go to the break room to chat with the guys.  I consider this my personal time before I begin working."); Decl. of Jeff Pierce (Day Shift Mechanic) ¶ 5 ("I typically arrive to work about 20-30 minutes prior to my scheduled shift.  I am not required to arrive early but prefer to do so because I do not like jumping right into work.  Before punching in, I generally have a cup of coffee but I consider it to be 'my time.'  I do not any work, or even touch my toolbox before punching in."); Decl. of Shawn Jaggers (Hot End Operator) ¶ 5 ("I arrive to the plant about a half hour prior to my schedule[d] shift because I do not like to rush.  This is my choice . . . .  After I put my boots on, I go to the break room and wait while I have a drink (coffee or water) and wait to clock in").

For years, this practice continued without controversy, as Durand paid its employees for the time they actually worked.  If employees performed work activities prior to their scheduled time, they were paid accordingly, either by submitting an overtime slip or by a Durand supervisor submitting one for them.  Specifically, although the setup of its timekeeping system at the time did not reflect the adjustment, Durand's supervisors, foremen, and payroll coordinator worked together to ensure that employees were paid for any work they performed prior to their shift, or after.  (Mauro Tr. at 49:10 to 50:2; 60:7 to 61:3; 65:21 to 67:20; 79:19 to 82:6).  All employees knew that, if they worked past their scheduled shift, or began work prior to their scheduled shift, they were to submit an overtime slip and they would be paid.  (Decl of Edgar

- 5 -

Wolbert ¶ 7; David Sutton ¶ 13)  There is not a single instance in the record of a Durand employee submitting an overtime slip and not receiving pay for the time submitted.  Nor is there any evidence, beyond Ms. Bobryk's personal claims, that Durand's employees actually performed work prior to commencing their shift for which they were not paid.

Nevertheless, Durand decided to change this practice—and institute its present clock-in/clock-out restrictions—after one of Durand's customers conducted a workplace audit and raised concerns over the perception that employees were clocked in well-before their scheduled shift but were not being paid for all of that time.  The audit revealed that, based on employee interviews from the time, employees were being paid for time actually worked, but were clocked in well-before they actually began working.  (Ex. T of Plaintiffs' Brief. Durand -06119). Nevertheless, as reflected in email correspondence, Durand was concerned that it may appear that its employees were working for all of the time they were clocked in but were not being paid for that time.  Although there was no evidence that this was the case, Durand decided to restrict its employees from clocking in earlier than seven minutes prior to their scheduled shift start time, or later than seven minutes after their scheduled shift end time.

As reflected in several employee declarations, the seven-minute clocking restriction did not change the work habits of Durand's workforce, only their habits with respect to clocking in. For example, James Pittman's testimony is that his practice is to arrive at the plant 30-45 minutes early and drink coffee and engage in other personal matters until his schedule shift time. (Pittman Decl. ¶ 8.).  Prior to Durand's restriction against clocking in prior to seven minutes before the scheduled shift time, Mr. Pittman used to clock in as soon as he arrived but would engage in the same routine: "Prior to the Company rule, I would clock in when I arrived but wouldn't perform any work until the start of my shift.  My routine has not changed.  I just simply

- 6 -

do not clock in now until 53 after the hour." (Pittman Decl. ¶ 11).

Similarly, Andrew Risley, a Relief Operator, stated that he typically arrives to the plant about thirty minutes prior to his shift because "I do not like to rush into my shift." (Risley Decl. ¶5). After he arrives, he puts on his boots and uniform (which he acknowledges is optional) and then goes to the break room to "eat, talk to my co-workers, and generally hang out." (Id. at ¶ 6). Mr. With respect to his practices after the institution of the seven-minute restriction, Mr. Risley stated, "[b]efore this rule was in place, I followed the same routine set forth above, except that I would typically clock in when I arrived at the plant. I always started work around my scheduled time despite clocking in well in advance." (Id. at 6). See also Declaration of Quanda Peterson (Packer) ¶ 6 ("I understand that the Company used to permit clocking in up to twenty minutes before the shift started, but, even then, I would not begin working until the start of my shift.").

2.    *Seven-Minute Grace Period and Rounding*

Beginning July 16, 2012, as a further step to improve its record keeping and time clock practices, Durand purchased a new time-keeping system, called Kronos, and instituted a seven-minute grace period for all shift punches. (Mauro Tr. at 16:3-11). The rules surrounding this grace period are programmed into the timekeeping system and are based on a seven-minute rounding rule that rounds in both directions. (Mauro Tr. at 9:4 to 11:16) Specifically, Durand rounds up to the next quarter hour for time that is seven minutes or less prior to the next quarter hour, and rounds down to the prior quarter hour for any punches that are less than seven minutes after the nearest quarter hour.[1] Some examples will illustrate the policy:

---

[1] Plaintiffs description of the rounding policy focused only on the rounding that does not benefit the employee. But, as Plaintiffs are well aware, the rounding policy rounds in both directions. Such rounding policies are expressly permitted by the FLSA, as discussed in detail below.

| Shift Begin Time | Actual Clock In Time | Rounded Time |
|---|---|---|
| 8:00 a.m. | 8:07 a.m. | 8:00 a.m. |
| 8:00 a.m. | 8:08 a.m. | 8:15 a.m. |
| 8:00 a.m. | 7:53 a.m. | 8:00 a.m. |
| 8:00 a.m. | 7:52 a.m. | 7:45 a.m. |
| **Shift End Time** | **Actual Clock Out Time** | **Rounded Time** |
| 4:00 p.m. | 4:07 p.m. | 4:00 p.m. |
| 4:00 p.m. | 4:08 p.m. | 4:15 p.m. |
| 4:00 p.m. | 3:53 p.m. | 4:00 p.m. |
| 4:00 p.m. | 3:52 p.m. | 4:45 p.m. |

The uniformity of this rounding policy is borne out in the several time records attached to this brief.  (Aiken Decl. at Exs. 2 though 9).  As shown in the table above, the rounding policy can work in either the employee's or Durand's favor.  For example, if an employee clocks in at 7:59 a.m. to begin his shift, but then clocks out at 3:53 p.m. to end his shift, the employee will be credited and paid for having worked a full eight hours, even though the employee was clocked in for only seven hours fifty-four minutes.  The same is true in reverse.  If an employee clocks in seven minutes early and seven minutes late, the time clock will round to show and pay for eight hours worked.

In every employee time sheet, there is rounding in favor of the employee, as well as rounding in favor of Durand.  (Aiken Decl. at Exs. 2 through 9).  There is no evidence that Durand's workforce, on the whole, was not free to take advantage of the rounding rules or that there was any policy that prevented them from doing so.  Although Plaintiffs cite to Durand's Attendance policy concerning lateness greater than three minutes, that policy has not been effect since the institution of the current grace period/rounding policy in July 2012, and employees currently receive points for lateness only if eight minutes late (or more).  (Ojeda Decl. at ¶ 4).

- 8 -

## C.   Time Clock Habits of Durand Employees Vary from Employee to Employee

There is no evidence of a uniform habit across Durand's workforce with respect to when employees clock in or out.  Some employees clock in at, or a few minutes before, their scheduled shift time, yet clock out almost exclusively at seven minutes prior to their shift time.  (See Kronos records of Goussev and Byrd attached to Aiken Decl. at Exs. 2 & 3).  Other employees tend to clock in at seven minutes prior to their scheduled shift, but at or just a few minutes before their scheduled shift end time.  (See Kronos records of Dale Mason attached to Aiken Decl. at Ex. 6).  And yet other employees show no specific tendency except that they clock in within the seven-minute grace period and clock out within the grace period.  (See Kronos records of Gerald Bricker attached to Aiken Decl. at Ex. 7).   Each of these approaches is acceptable under Durand's grace period/rounding policy.   There is no evidence of Durand adjusting or manipulating these punches, or that Durand took any action to prevent employees from receiving the benefit of its rounding rules.

Further, there is no unifying rule or explanation for the differences among the various approaches to clocking in.  For example, of the fifty-one employee time records that are in the record, six are for employees from Durand's Mold Shop.   Of those six employees, four employees—a QC Controller, a Mold Shop Machinist, a Mold Fitter, and a Mold Polisher— showed a tendency to clock in a couple of minutes prior to their shift time and to clock out seven minutes prior to their shift end time.  (See Kronos records attached to Aiken Decl. at Exs. 2, 3, 4 & 9).  All four employees benefited from the rounding rules in the aggregate, including one who benefited from the rounding rules by 1,507 minutes on aggregate over the course of fourteen months.  (Id.).  The other two Mold Shop employees—a Mold Shop Shift Crew Leader and a Mold Welder—did not benefit from the rounding rules on aggregate, with the Crew Leader

- 9 -

rarely taking advantage of the rounding rules (e.g., by clocking out seven minutes early). (Id. at Exs. 5 & 8).

### D. **Durand Employees' Use of PPE Varies by Position**

At Durand, the required personal protective equipment ("PPE") consists of ear plugs, safety glasses, and appropriate footwear. Each position requires different PPE. A chart listing the PPE required by each department is set forth below.

| JOB TITLE | # OF EES | Level I PPE (Glasses and Earplugs) | Level II PPE (Glasses, earplugs, and protective toe boots) |
|---|---|---|---|
| QUALITY CONTROL | 22 | X | |
| WAREHOUSE | 35 | X | |
| COLD END Fork lift drivers | 24 | X | |
| VAP DEPT. | 5 | X | |
| DECORATING DEPT. | 17 | X | |
| DEC. PC | 0 | X | |
| DECORATING (CARDINAL) | 1 | X | |
| COLD END (Includes Packers) | 205 | X | |
| PROCUREMENTStoreroom | 6 | X | |
| MOLD AND MOLD Q.C. | 56 | X | |
| | 371 (62%) | X | |
| | | | |
| BATCH/FURNACE | 13 | | X |
| MAINTENANCE Plant Equip | 14 | | X |
| MAINTENANCE Press Mach. Rpr | 12 | | X |
| MAINTENANCE Rotary Mach. Rpr | 17 | | X |
| MAINTENANCE Pro. Conrl Shop | 14 | | X |
| MAINTENANCE Cold End | 10 | | X |
| PRIMARY | 91 | | X |
| PRIMARY Press | 23 | | X |
| PRIMARY Rotary | 26 | | X |
| PRIMARY SEVP | 8 | | X |
| | 228 (38%) | | X |

- 10 -

(Ojeda Decl. at ¶ 3).  Attached at Exhibit 10 to the Aiken Declaration is a PPE Chart showing PPE requirements of each position, but reflecting the same information.  As shown by the above chart and the one attached as Exhibit 10, most positions in the plant (about 62% of the hourly workforce) require only earplugs and safety glasses, which take seconds to put on. (Ojeda Tr. at 150:4-9).  Indeed, as one of the putative opt-in Plaintiffs has testified, she simply put this equipment on while walking onto the packing floor.  (Brownlee Tr. at 41:22 to 42:6). The remaining 38% of the hourly workforce requires only the addition of steel-toed shoes, which, like all shoes, take a few minutes to put on, and can be worn into the plant, which many employees do.  (Ojeda Tr. 144:13 to 145:11; Decl.of Clarence Nichols (Batch House Operator) ¶ 6) ("I come to work with my safety boots on."); Decl. of Brian Rio ¶ 7 ("I wear my boots into work."); Brownlow Tr. at 29:16-24 ("I wore [boots] into the building.").

Any other protective equipment that may be needed throughout the day is not worn by employees at the beginning of their shifts and is available on the production floor.  This includes any respiratory masks, gloves, and other specialized equipment.  (See Brownlow Tr. at 41:5 to 42:14) (left mask at workstation at end of shift).  Decl. of Freddy Roig (PW Technician), ¶ 8) ("I wear steel toed boots, safety glasses, and ear plugs.  On occasion, I wear chemical gloves or a face shield when I am doing welding which I put on and take off in the course of my work while clocked in."); Decl. of Clarence Nichols (Batch House Operator) ¶ 7 ("Once I arrive at [my work area] after clocking in, I put on my dust mask and my gloves which I keep in my back pocket."); Decl. of Shawn Hogan (Production Set Up) ¶ 9 ("I also wear hot gloves while performing certain tasks during the day."); Decl. of Thomas Swanson (Electrician) ¶8 ("On occasion, I will wear a 'flash suit' when working with high voltage.  I will change into a flash suit, as necessary, during

- 11 -

my shift."); Decl of Thomas Schroder (Fusion Leader) ¶ 8 ("Sometimes I also wear a mask,

depending on what I am doing.").

Moreover, there is no requirement that employees must remove any PPE at the end of

their shift or thereafter.  (Ojeda Tr. at 93:12 to 95:12; )

### E.   Uniforms and Other Clothing or Equipment

No employee is required to wear a uniform.  (Ojeda Tr. at 109:18 to 111:4 and 143:6 to

144:1).  But, about 1/3 of the workforce does.  (Ojeda Tr. at 143:12-18).  The rest do not.

Contrary to the claims in Plaintiffs' Brief, the uniforms are not fire retardant.  (Ojeda Tr. at

110:11-16).[2]  Nor are employees required to wear special, fire retardant clothing.  (Ojeda Tr. at

110:5-16).  Rather, pants (such as blue jeans) and a t-shirt (long-sleeved for some positions) are

all that are required.  (Ojeda Tr. at 143:12 to 144:9)  In other words, employees can wear regular,

"street clothes."  Ms. Bobryk herself wore jeans and what she claims was a fire-retardant

uniform shirt.  (Bobryk Tr. at 45:19 to 46:8).  There is no requirement that employees put on any

clothing at the plant; and many employees come to work fully dressed, and leave without

changing or showering.  (Ojeda Tr. 143:12 to 144:12; Decl. of Quanda Peterson (Packer) ¶ 10 ("I

wear my work shoes into the plant each day and home after my shift.  I could get changed at the

plant if I wanted to, but I choose not to do so."); Decl. of Dale Mason (Packer and Forklift

Driver) ¶ 8 ("I do not usually change my clothes at the plant, and I choose not to wear a

uniform.").  Others choose to change into work clothes or a uniform at the plant, and also put on

different shoes or boots, depending on the PPE requirement for their position.  (Rydel Decl. at ¶

9; Bowser Decl. at ¶ 5; Garcia Decl. at ¶ 9; Bricker Decl. at ¶ 9).  This is a matter of convenience

---

[2] As of July 2013, Durand began offering fire-resistant uniforms to employees who chose to wear
uniforms at all, which is still optional.  (Ojeda Decl. at ¶ 6).  As of July 2013, Hot End
employees and Mechanics must choose a fire-resistant uniform if they do choose to wear a
uniform.  (Id.).

- 12 -

and is entirely up to the employee.  (See Bricker Decl. at ¶ 9 ("Some of the guys on the Hot End shower and change at the plant; some do not.")).

Among those who wear uniforms, some take a clean uniform home at the end of their shift so that they can be dressed prior to arriving at the plant.  (Ojeda Tr. at 144:2-9; Decl. of Andrew Risley (Relief Operator) ¶ 6 ("Sometime I take a clean uniform home with me so that I can arrive to work in my uniform the next day.").  The same is true of footwear—some wore their footwear into the plant, while others chose to change in the locker room.  (Decl. of John Wojculewski (Set Up Decorator) ¶ 8 ("I generally do not change my shoes at the plant.").  For 62% of Durand's workforce, the only footwear required are shoes that are closed at the toe (as opposed to sandals) and have 3/4 inch sole.  (See PPE Chart, attached to Ojeda Decl. at Exhibit 2).  Many sneakers qualify as appropriate footwear, or "safe shoes."  (Ojeda Tr. 144:13-20).  The other 38% of the workforce must wear "safety shoes," which are shoes with a protective toe— usually steel-toed boots.  These employees are free to wear their boots to and from work, or change at the plant, as discussed above.

Showering is also optional.  Many employees do not shower at the end of their shift. (See Decl. of Brian Rio ¶ 7;  Decl. of Gerald Bricker ¶ 9; Decl. of Dale Mason ¶ 8 ("Although I also do not typically shower at the plant, sometimes I will do so for my own convenience."); Decl. of William Seda ¶ 7 ("I have the option of showering and changing clothes at the plant, but I choose not to do so.").

Only some employees at Durand use tools, and most keep those tools at their work station, which they access after they clock in and begin working.  (Brownlow Tr. at 41:17-21; Decl. of John Wojculewski (Set Up Decorator) ¶ 9 ("All the tools that I need I leave at my workstation in the decorating area.")  Many positions, including Packer, do not require the use of

- 13 -

any tools. (Golden Tr. at 27:16-22; Brownlow Tr. 48:21-23). Also, Mold Shop employees (about 60 employees) and Warehouse employees (about 50) were not required to report to work with tools. (Ojeda Tr. at 147:9-21).

## III.   ARGUMENT

Plaintiffs have failed to meet either the Rule 23 standards,[3] or the FLSA standards, for certifying, or conditionally certifying, a class. Foremost, Plaintiffs have failed to explain, much less prove, how the named Plaintiff's experiences apply to the many different employees and work experiences among Durand's workforce of more than 500 employees.

### A.   <u>Standard Applicable To A Motion For Class Certification</u>

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of" individual parties. <u>Wal-Mart Stores v. Dukes</u>, 131 S. Ct. 2541, 2550 (2011). To avail herself of this exception for purposes of pursing her Rule 23 class action, Plaintiff must prove all requirements for class certification are satisfied. <u>Id.</u> Rule 23(b) (3) permits class certification only if Plaintiffs demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b) (3); <u>Adami v. Cardo Windows, Inc.</u>, CIV. 12-2804 JBS/JS, 2014 WL 320048 (D.N.J. 2014).

---

[3] Plaintiffs bring claims under the New Jersey Wage and Hour Law that are identical to their FLSA claims. The analysis of the claims is the same, as the New Jersey law is generally interpreted in an identical manner to the FLSA. <u>Cannon v. Vineland Hous. Auth.</u>, 627 F. Supp. 2d 171, 176 n. 4 (D.N.J. 2008) (noting that FLSA and New Jersey wage and hour laws employ same test for overtime claims). Specific to this case, the New Jersey Department of Labor has adopted, verbatim, the federal regulations pertaining to "Use of Time Clocks," including rounding. <u>See</u> N.J.A.C. §12:56-5.8(b).

PHLIT/ 2213413.4

As Judge Simandle recently wrote, "[i]f proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." Cardo Windows, Inc., CIV. 12-2804 JBS/JS, 2014 WL 320048 (quoting Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 172 (3d Cir. 2001)). "Plaintiffs must show that the elements of their claim are capable of proof at trial through evidence that is common to the class rather than individual to its members . . . [and] the court must envision a trial of plaintiffs' claims, and conduct a rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove their claims." Cardo Windows, Inc., 2014 WL 320048 at *13 (citing Sherman v. Am. Eagle Exp., Inc., 2012 WL 748400, at *8 (E.D. Pa. Mar. 8, 2012)). The burden remains with Plaintiffs to make this showing. Id.

In addition, prior to reaching the Rule 23(a) requirements, Plaintiff must prove that the proposed class is ascertainable. This requires proof of two elements. First, the class must be able to be defined through objective criteria. Second, Plaintiff must establish "a reliable and administratively feasible mechanism for determining whether putative class members will fall within the class definition." Cardo Windows, 2014 WL 320048, at *14 (citing Hayes v. Wal–Mart Stores, Inc., 725 F.3d 349, 355 (3d Cir.2013)). "'If class members are impossible to identify without extensive and individualized fact-finding or 'minitrials,' then a class action is inappropriate.'" Cardo Windows, 2014 WL 320048, at *14 (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 593 (3d Cir.2012)). A class is not readily ascertainable based on objective criteria, and certification must be denied, if a proposed class definition requires either a merits determination on liability or individualized fact-finding to identify class members. Marcus, 687 F.3d at 593 ("If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate."); In re Merck &

<u>Co., Sec. Derivative & ERISA Litig.</u>, MDL No. 1658, 2013 U.S. Dist. LEXIS 13511, at *72 (D.N.J. Jan. 30, 2013) ("A proper class definition must not require a merits determination to identify the potential plaintiffs ... ."); <u>Agostino v. Quest Diagnostics, Inc.</u>, 256 F.R.D. 437, 479 (D.N.J. 2009) ("A court must reject a proposed class or subclass definition that inextricably intertwines identification of class members with liability determinations.") (internal quotations and citations omitted).[4] The ascertainability requirement eliminates administrative burdens that are inconsistent with the efficiencies expected in a class action by insisting on the easy identification of class members. <u>Marcus</u>, 687 F.3d at 593.

**B.    Rule 23 Requirements**

A class also cannot be certified unless the party seeking certification proves by a preponderance of the evidence that each of the requirements of Rule 23 are satisfied. <u>Marcus</u>, 687 F.3d at 595. Rule 23 is not a mere pleading standard. A party seeking certification "must affirmatively demonstrate" with evidence that the requirements of Rule 23 are "in fact" satisfied. <u>Dukes</u>, 131 S. Ct. at 2551. To determine if a plaintiff carried its burden of proof, a court must undertake a "rigorous analysis of the evidence and arguments." <u>Marcus</u>, 687 F.3d at 591. Frequently this rigorous analysis will entail some overlap with the merits of the plaintiff's claim because the class determination involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action. <u>Dukes</u>, 131 S. Ct. at 2551-2552.

Plaintiffs have failed to meet their burden in several respects.

---

[4]   <u>See also</u>, <u>e.g.</u>, <u>Johnson v. GEICO Cas. Co.</u>, 673 F. Supp. 2d 255, 268 (D. Del. 2009) ("membership in the [class] is not ascertainable based on objective criteria because it would entail inquiry into the merits of the putative members' claims"); <u>Forman v. Data Transfer</u>, 164 F.R.D. 400, 403 (E.D. Pa. 1995) (holding that "proposed class definition is untenable" because it requires court to decide "the central issue of liability to be decided in the case").

C.   **Plaintiffs Cannot Identify An Ascertainable Class Based on Objective Criteria.**

Plaintiffs' proposed class consists of "all hourly production employees." This broadly defined class is warranted, according to Plaintiff, based on Plaintiffs' claim that each employee in the proposed class was "subject" to the same time-clock policies, and had to perform pre and post shift activities for which they were not paid, particularly the "donning and doffing" of "required PPE," gathering of tools, and post-shift showers. Given the basic factual background in this matter, this definition does not satisfy the ascertainability requirement because it would require the Court to resolve the merits of each employee's claim against Durand.

1.   *There Is No Uniform Policy or Practice Requiring Pre or Post Shift Duties Across the Class.*

Plaintiffs have also failed to establish an ascertainable class with respect to alleged off-the-clock and pre and post-shift duties. Rather, Plaintiffs cite primarily to Ms. Bobryk's own anecdotal claims about her duties as a Cold End Electromechanic and then invite the Court to assume that the other 500+ employees who work in different positions also perform such duties. Plaintiffs have also cited generally to Durand's expectation that employees be prepared to begin working at their scheduled shift time as evidence that there must be pre-shift duties occurring, particularly in "donning" PPE. Plaintiffs have again failed to establish an ascertainable class on this point. Indeed, when asked if she was aware of any other position at the plant that engaged in the same pre-shift routine as she did, Ms. Bobryk admitted that she did not, and that "everybody's routine was different." (Bobryk Tr. at 63:8 to 64:12 & 67:5-14).

With an exception for Ms. Bobryk (who claims she engaged in a litany of pre and post shift work activities, which Durand disputes) Durand's entire workforce can walk into the building from the parking lot, clock in, and walk to their assigned work area, without performing any work tasks. They can also leave their assigned work area, clock out, and head straight to the

- 17 -

parking lot. As with any job, there are opportunities to do other things prior to and after an employee's shift (change, socialize, drink coffee, etc.), but none of it is required, or properly classified as compensable work. There is simply no evidence of a classwide policy or practice requiring any pre or post shift duties. Plaintiffs have attempted to cloud this issue through dramatic references to donning and doffing PPE, and the dangers associated with lead or cadmium, but these claims do not hold up on inspection.

First, Plaintiffs' claims on behalf of herself and others of exposure to harmful chemicals is baseless. Durand has not used any lead-based materials since at least 2006.[5] (Ojeda Decl. at 5). Durand's Decorators use masks and were previously required to wear uniforms, but they have not been required to do so in the past eight years, are not required to wear masks but, in any event, do not need to put them on until they are at their work station, already clocked in. (Ojeda Decl. 5). Cynthia Brownlow, who worked as both a Packer and a Decorator, testified that her concerns over chemical exposure, though speculative and unfounded, only related to her work as a Decorator, not as a Packer. (Brownlow Tr. at 28:12-19). Thus, there is no support for Plaintiffs' claims that showers or changing out of work clothes were essential to Durand's operations for any position, let alone on a classwide basis.

Second, neither changing into uniforms nor putting on or taking off PPE is compensable time in this case. Under Third Circuit law, putting on and taking off work clothing or PPE is not compensable time unless it is "integral and indispensable to the employer's principal activities." De Asencio v. Tyson Foods, 500 F.3d 361 (3d Cir. 2007). Further, "the changing of clothes on the employer's premises" is not integral to the employer's principal activities unless required by

---

[5] Plaintiffs also offer the hearsay testimony of opt-in Plaintiff, Cynthia Brownlow, who worked as a decorator for parts of her time with Durand, who claimed that someone told her in 2004 not to take her boots home so as not to expose her children to any harmful materials. As do many employees, Ms. Brownlow always wore her boots in and out of the plant.

- 18 -

law, by rules of the employer, or by the nature of the work." Id.

At Durand, uniforms are not required at all. This is borne out by the fact that only about 1/3 of its workforce actually wears a uniform. Indeed, the putative opt-in Plaintiff, Ms. Brownlow testified that she wore everyday casual clothes when working as a Packer. Many declarants also confirmed that they do not wear a uniform, while some do. Among the uniform wearers, some come into work already dressed in the uniform and take a clean uniform home with them instead of using Durand's locker room. And, although PPE is required, employees are not required to put on PPE at the plant. It is important to recall that PPE in this case means only safety glasses and ear plugs, which take seconds to put on.[6] All employees are required to wear either safe shoes (regular "street shoes" and other shoes with sufficient soles qualify) or safety shoes (steel-toed boots), but these can also be worn into the plant, with no need to change in the locker room. Also, employees who need to use other protective gear besides glasses and ear plugs—such as fire retardant protective gear or respiratory masks—have such gear available to them on the production floor, after they have clocked in and begun working; there is no requirement that such special equipment be worn at the beginning of the shift.

Finally, there is no evidence that Durand's work force engages in the same or similar pre or post shift duties as Ms. Bobryk. As Ms. Bobryk agreed in her testimony, "when somebody would come in really depended on their job and that particular person . . . [which] "varied wildly as to when that would be." (Bobryk Tr. at 100:4-10). To the contrary there is substantial evidence of many differences among Durand's one hundred positions and what is required of each in order to be prepared to work. For example, employees in the Packer position (there are about 112 in the proposed class) do not use tools, do not use a bike, do not have access to

---

[6] Defendant will provide to the Court the safety glasses and ear plugs employees are required to have on while working.

- 19 -

computers, and do not usually have a "shift report" conversation with the person they are relieving from their shift. (Brownlow Tr. at 47:15 to 48:2). Further, Ms. Brownlow agreed that her claims of needing to change into a uniform applied only to the Decorator position; as a Packer, she wore casual clothes and did not use the locker rooms at all. (Brownlow Tr. at 26:10-12 & 40:8-11). Even within the Decorator position, Ms. Brownlow testified that one of the two Decorators on duty was responsible for having tools, checking machines, and having a brief shift handover conversation, while the other Decorator was not. (Brownlow Tr. at 46:4 to 47:1; & 63:11 to 64:24) ("The other person that worked with me the same shift had different job duties, didn't have as much to do as I did . . . They didn't relieve people . . . they didn't need the tools . . .").

    In addition, there are about 40 positions that are not shift-based positions, meaning there is no shift changeover. In addition to not needing to gather tools or a bicycle, employees in these positions do not relieve anyone, and are not relieved, so there are no pre or post shift hand-off conversations or meetings. On the other hand, there is another group of employees, the Chief Operators (of which there are 15), who are scheduled to attend a pre-shift meeting that begins at fifteen minutes prior to the scheduled shift change. Chief Operators from both the off-going and on-coming shifts attend this meeting. The oncoming Chief Operators clock in around fifteen minutes prior to the scheduled shift time and are paid accordingly. (Bricker Decl. ¶¶ 7 & 8). The meeting is concluded, necessarily, before the next shift begins, so the off-going Chief Operators clock out within the seven-minute grace period for the shift end. (Aiken Decl. Ex. 7; Bricker Time Records).

    The foregoing are merely examples of the varied pre and post shift requirements—or lack thereof—across Durand's workforce. Plaintiffs have not even attempted to address these

differences, let alone prove how Ms. Bobryk's personal pre-shift activities are applicable to the entire proposed class that includes 100 different positions in thirteen departments. Nor have Plaintiffs identified compensable pre or post shift activities that each proposed class member performs such that the class can be ascertained through an objective measure. Accordingly, Plaintiffs have not carried their burden of establishing an ascertainable class with respect to compensable pre and post shift work. Cf. Briggins v. Elwood TRI, Inc. 882 F. Supp. 2d 1256, 1276 (N.D. Ala. 2012) (finding class treatment inappropriate where plaintiffs did not "propose any method of giving representative testimony that will fairly encompass all the various job duties and processes the associates perform at the HMA facility.").

        2.     *Durand's Grace Period/Rounding Policy Is Lawful and Plaintiffs Do Not Identify an Ascertainable Class Related to this Policy.*

As an initial matter, Plaintiffs have not established that Durand's current seven minute grace period and rounding policy is unlawful. Nor have Plaintiffs established that the entire proposed class was denied overtime because of this policy.

The DOL has long approved employers' use of time rounding policies so long as the policy is applied in such a way that "it will not result, over a period of time, in failure to compensate the employee properly for all the time they have actually worked." 29 C.F.R. § 785.48(b). The full text of the relevant Department of Labor regulations read as follows:

> (b) "Rounding" practices. It has been found that in some industries, particularly where time clocks are used, there has been the practice for many years of recording the employees' starting time and stopping time to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour. Presumably, this arrangement averages out so that the employees are fully compensated for all the time they actually work. ***For enforcement purposes this practice of computing working time will be accepted, provided that it is used*** in such a manner that it will not

result, over a period of time, in failure to compensate the employees properly for
all the time they have actually worked.

29 C.F.R. § 785.48(b) (emphasis added).

Thus, for purposes of enforcing this regulation, the DOL focuses on how the rounding

policy is setup, or "used."  So long as it is used fairly, "[t]he presumption underlying § 785.48(b)

is that this arrangement averages out so that employees are fully compensated for all the time

they actually work." East v. Bullock's, Inc., 34 F. Supp. 2d 1176, 1184 (D.Ariz. 1998).  There is

no requirement in Section 785.48(b) that the rounding must ultimately average out in hindsight.

If that were the case, no employer could have assurance of the legality of its policy until it has

the opportunity to audit past employee punches and pay records after a sufficient period of time

has elapsed.  Accordingly, the proper focus in reviewing a rounding policy is on whether the

policy is inherently fair and applied so as not to favor the employer.  Contini v. United Trophy

Mfg., Inc., 6:06-CV-432-ORL-18UA, 2007 WL 1696030. at *4 (M.D. Fla. 2007) ("The time

clock rounding was equally applied to all Defendant's employees, and worked both to the benefit

and detriment of the employees (i.e., you could gain or lose up to 7 minutes of time), and

therefore is not a violation of the FLSA."); see also Adair v. Wis. Bell, Inc., No. 08-C-280, 2008

WL 4224360, at *11 (E.D. Wis. Sept.11, 2008) (approving policy where there was no evidence

to suggest it systematically favored employer).

Here, Durand's seven-minute rounding policy favors both employee and employer,

equally, and the record shows instances of employees taking full advantage of the rounding rules

to their benefit, along with instances of employees not taking advantage of the rounding rules, to

Durand's benefit.  There is no evidence or apparent tendency which explains why one employee

would benefit more or less from the rounding rules; and Plaintiff has not attempted to offer any.

In terms of class treatment, there is no explanation or policy that helps to identify employees

who are more or less likely to benefit from the rounding rules.

- 22 -

Plaintiffs have attempted to shift the focus away from the inherent fairness of Durand's rounding policy by claiming that a greater percentage of punches over a select three-week period in November were rounded in Durand's favor. This, Plaintiffs claim, shows that Durand's policy is not neutral. Plaintiffs miss the point and, in the process, highlight their inability to identify an ascertainable class.

If Plaintiffs were correct in their approach to determining the legality of the rounding policy (i.e., through hindsight examination of employee punches to track which party is receiving the benefit), then the only way to ascertain whether an employee should be included in the class is to examine and tally all of the employee's punches to determine the net impact of the rounding rules on that particular employee. The record reveals instances where, on aggregate, the employee benefited from the rounding rules, and also instances where Durand benefited. Although the case law and the regulations do not pin legality on a hindsight review of time records, Plaintiff's proposed approach inherently would preclude class treatment. There is no way to identify potential plaintiffs on this record without tallying each employee's punches. Some specific examples of an analysis of employee time records will illustrate this point.

First, there are several examples of employees who benefited, on the aggregate, from Durand's rounding rules. One example is the employee Stanislaw Goussev. Mr. Goussev has 275 days in which he worked between July 16, 2013, and September 20, 2013. This means he clocked in and out on each day, for a total of 550 punches. Of those 550 punches, 276 rounded in his favor, 200 rounded in Durand's favor, and 74 were neutral in that they reflected a punch on a precise quarter hour. (Aiken Decl. ¶ 6, Ex. 2). Further, it is apparent from Mr. Goussev's punches that he had a tendency of clocking in somewhere between his scheduled shift time and three minutes prior, and that he almost always clocked out seven minutes prior to his scheduled

- 23 -

shift end time.[7]  Indeed, Mr. Goussev clocked out after his scheduled shift time only twice in this fourteen-month period (3:01 p.m. on 12/5/2012 and 3:09 p.m. on 3/26/2013), and received the benefit of the rounding rule on one of those occasions because his clock out time of 3:09 p.m. was rounded up to 3:15 p.m., consistent with Durand's rounding rules.  In terms of total time, Mr. Goussev received the benefit of 1,507 minutes in his favor from the rounding policy.  (Aiken Decl. ¶ 6, Ex. 2).

On the other hand, a fellow worker in the same department as Mr. Goussev (the Mold Shop), Daniel McMeekin, received the benefit of the rounding rules in 220 punches, while Durand received the benefit of the rounding rules in 309 punches.  (Aiken Decl. ¶ 9, Ex. 5).  This resulted in a net benefit to Durand of 302 total minutes over the course of about fourteen months, or less than one minute per day.  Under Plaintiffs' proposed approach, Mr. McMeekin would be a proper class member because the rounding rules did not ultimately work in his favor; but, Mr. Goussev could not be a class member because he ultimately benefited from the rounding rules. In other words, based on Plaintiffs' argument, their position would be that the rounding policy is unlawful with respect to Mr. McMeekin but lawful with respect to Mr. Goussev.  In addition to being inconsistent with the DOL's regulation on this point, this type of individual merits determination is inherently inconsistent with class treatment and precludes the finding of an ascertainable class.  More important to the present motion, Plaintiffs have not identified a practicable method for identifying potential class members under these facts, which vary from class member to class member.  Cardo Windows, Inc., 2014 WL 320048, at *14-15  (D.N.J. 2014) (Plaintiffs' maintain the burden to articulate a practicable method to identify potential class members in light of the differences among Cardo's installers discussed above."; denying

---

[7] The referenced records are made exhibits so that the Court may review them for itself.  See Aiken Decl. Exs. 2 through 9).

Rule 23 certification).

3.    *Plaintiffs Have Not Identified An Ascertainable Class With Respect to Durand's Previous Time Keeping System.*

With respect to Durand's previous timekeeping system, Plaintiffs again fail to meet the burden of showing a classwide practice or policy that worked to deny the entire class overtime. Plaintiffs seem to assume that paying according to the scheduled times is *per se* unlawful. To the contrary, the federal regulations specifically state that, "in those cases where time clocks are used, employees who come in before their regular starting time or remain after their closing time, do not have to be paid for such periods provided, of course, that they do not engage in work. Their early or late clock punching may be disregarded." 29 C.F.R. § 785.48(a).

As with the rest of her claims and proposed class, Ms. Bobryk has identified only how she was impacted by the former timekeeping system. The rest of her argument asks the Court to assume that any discrepancies between the time clock and employee pay is unlawful. Plaintiffs also quote, dramatically, an email from Stephanie Ojeda in which she expresses concerns over the customer audit and Durand's permitting employees to clock in well-before their scheduled shift. Plaintiffs attempt to cast this email as some sort of admission of wrongdoing when, in fact, Ms. Ojeda was merely acknowledging the difficult situation that would be presented in attempting to prove that employees were not working even though they were clocked in. More important to this motion is the fact that there is no evidence of actual work being performed until the scheduled shift time. Most important, however, is that there is no evidence of a classwide policy that denied Durand's employees overtime for time actually worked. Nor is there an identifiable set of pre or post shift duties that each proposed class member performed such that class membership is ascertainable without individualized inquiries.

Further, although the timekeeping system would round to an employee's scheduled time,

there is substantial undisputed evidence that Durand did not rely exclusively on the timekeeping system to track overtime. Rather, it had a system in place among the shift supervisors, employees, and payroll administrators by which they tracked employee work that was outside of the scheduled time. Ms. Bobryk described Durand's system at the time, succinctly, as "[f]ill out a slip, get it approved." (Bobryk Tr. at 102:17-20). Indeed, Ms. Bobryk testified that she filled out overtime slips when she felt it was "justified" and was never denied overtime when she filled out an overtime slip. (Bobryk Tr. at 102:17 to 105:11 & 106:9-23).

If Durand missed paying for time worked, there is no evidence that this occurred on a classwide basis. Rather, such instances would be sporadic, at best, with no evidence to suggest underpayment occurred with any regularity, much less to every class member. And, there is no evidence that Durand's practice of using overtime slips and monitoring employee activities on a department-by-department basis to ensure that all overtime is captured and paid was ineffective, particularly not on a classwide basis. Moreover, a class based on an alleged policy of rounding to scheduled work time would require individualized inquiries to determine if any particular class member was harmed by that policy in the form of unpaid overtime. Briggins v. Elwood TRI, Inc. 882 F. Supp. 2d 1256, 1274 -1275 (N.D. Ala. 2012) (decertifying class based on policy of paying to "scheduled time" because "not only would damages be highly variable, the court doubts the plaintiffs can even establish class wide liability."). Given the substantial record to the contrary, Plaintiffs have failed to demonstrate that they can demonstrate liability without mini-trials. Thus, their proposed class fails to meet the ascertainability requirement with respect to Durand's previous time-keeping system.

4.    *Exploration of the De Minimis Doctrine with Respect to Each Employee Also Counsels Against Finding an Ascertainable Class*

Even pre-shift activity appropriately classified as "work" is not compensable if it is *de*

*minimis.* As the United States Supreme Court has ruled, "[w]hen the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded." See Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 692 (1946). The *de minimis* defense embodies the law's recognition that "[s]plit-second absurdities are not justified by the actualities of working conditions." Anderson, 328 U.S. at 692. "Rather, it 'is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved.'" Douglas Troester v. Starbucks Corporation et al, Docket No. 2:12-cv-07677 (citing Anderson). As a general guideline, ten minutes or less of time, per day, is considered *de minimis.* Lindow, 738 F.2d at 1062 (collecting cases); see also Busk v. Integrity Staffing Solutions, Inc., 713 F.3d 525, 532-33 (9th Cir. 2013) (concluding that five minutes daily spent passing through security clearance on way to lunch break was de minimis); Gillings v. Time Warner Cable LLC, 2012 WL 1656937, at *1, 4 (C.D. Cal. Mar. 26,2012) (rejecting a plaintiff's claim for unpaid wages because the six minutes that it took each day to log in to a computer program was de minimis and would be "arduous" to monitor and record); Farris v. County of Riverside, 667 F. Supp. 2d 1151, 1166 (C.D. Cal. 2009); Alvarado v. Costco Wholesale Corp., 2008 WL 2477393, at *3-4 (N.D. Cal. June 18, 2008) (holding that the plaintiff was not entitled to compensation for time spent waiting for security checks at the end of closing shifts because the "several minutes" that the plaintiff had to wait to be let out of the building was de minimis); Abbe v. City of San Diego, 2007 WL 4146696, at *7 (S.D. Cal. Nov. 9, 2007) ("Here, it is undisputed that donning and doffing protective gear . . . takes less than 10 minutes. . . . Therefore, time spent donning and doffing safety gear is de minimis and non-compensable as a matter of law.").

To determine whether work time is *de minimis*, courts consider: "(1) the practical

administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." De Asencio v. Tyson Foods, Inc., 500 F.3d 361, 374 (3d Cir.2007) (citing Lindow v. United States, 738 F.2d 1057, 1063 (9th Cir. 1984); see also Ru tti v. Lojack Corp., Inc., 596 F.3d 1046, 1056-57 (9th Cir. 2010). Applying these standards, numerous courts have held that daily periods of ten minutes or less are de minimis. Lindow, 738 F.2d at 1062 (collecting cases); see also Busk v. Integrity Staffing Solutions, Inc., 713 F.3d 525, 532-33 (9th Cir. 2013) (concluding that five minutes daily spent passing through security clearance on way to lunch break was de minimis); Gillings v. Time Warner Cable LLC, 2012 WL 1656937, at *1, 4 (C.D. Cal. Mar. 26,2012) (rejecting a plaintiff's claim for unpaid wages because the six minutes that it took each day to log in to a computer program was de minimis and would be "arduous" to monitor and record); Farris v. County of Riverside, 667 F. Supp. 2d 1151, 1166 (C.D. Cal. 2009); Alvarado v. Costco Wholesale Corp., 2008 WL 2477393, at *3-4 (N.D. Cal. June 18, 2008) (holding that the plaintiff was not entitled to compensation for time spent waiting for security checks at the end of closing shifts because the "several minutes" that the plaintiff had to wait to be let out of the building was de minimis); Abbe v. City of San Diego, 2007 WL 4146696, at *7 (S.D. Cal. Nov. 9, 2007) ("Here, it is undisputed that donning and doffing protective gear . . . takes less than 10 minutes. . . . Therefore, time spent donning and doffing safety gear is de minimis and non-compensable as a matter of law.").

Here, Durand contends that any of the pre or post shift activities that Plaintiffs alleged amount to de minimis time inasmuch as the activities—if compensable at all—take only a few minutes, at the most. Indeed, some employees have only to put on ear plugs and glasses, which takes seconds. And, although the time spent putting on and taking off uniforms and steel-toed

- 28 -

boots (which only some employees do) are not compensable activities, those activities take three to five minutes, total.  Those who arrive to the plant already dressed and then leave the plant in the same clothes would have "donning and doffing" claims that number in the seconds per day.

Examining the *de minimis* doctrine with respect to each employee's alleged pre and post shift activities, as well as the ultimate effect of the rounding rules on the time punching habits, will require individual merits determinations for each potential class member.  There is no other way to resolve these issues for each class member.  And, Plaintiffs have failed to demonstrate otherwise.  Accordingly, the *de minimis* doctrine, which looms large in this case, precludes a finding of an ascertainable, or otherwise manageable, class in this case.  See Briggins v. Elwood TRI, Inc., 882 F. Supp. 2d 1256, 1276 (N.D. Ala. 2012) (with respect to *de minimis* defense, stating, "[t]his court cannot discern how the plaintiffs will proceed in this case in a way does not unduly prejudice the defendants without the case devolving into mini-trials for each plaintiff."); Smith v. T-Mobile USA, Inc., 2007 WL 2385131, at *8 (C.D. Cal. 2007) ("Other defenses, such as that Defendants' managers did not know about off-the-clock work, that any claims are barred by specific defenses under the FLSA as to what constitutes 'work,' or the *de minimis* exception to the FLSA, must, by their nature, be individualized. Thus, Plaintiffs are not similarly situated with respect to how these defenses would be litigated against them.");

### D.   Certification Under Rule 23(b)(3) Would Be Inappropriate

A class cannot be certified under Rule 23(b)(3) unless the plaintiff proves that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Plaintiffs cannot prove either.

- 29 -

1.    *Individual Issues Predominate*

The predominance requirement tests whether proposed classes are sufficiently cohesive to warrant class adjudication. In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 310-311 (3d Cir. 2008).  The standard is far more demanding than the commonality requirement of Rule 23(a).  *Id.*  If the essential elements of liability require individualized proofs, class certification is unsuitable.  *Id.*  Moreover, even if common evidence may establish liability, certification must be denied where damages are not "capable of measurement on a classwide basis" and, therefore, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." Comcast v. Behrend, 133 S. Ct. 1426, 1432-33 (2013).

2.    *Common Evidence Cannot Prove Potential Class Members' Claims.*

As with the rest of the Rule 23 requirements, Plaintiffs give the predominance requirement only passing treatment in their brief.  They claim that they satisfy the predominance requirement because "damages can be ascertained easily" by comparing the time punches to payroll records.  Similar to their failure to establish ascertainability, Plaintiffs have fallen well-short of meeting their burden on the predominance inquiry.

The primary flaw in Plaintiffs' argument is that it presumes, without proof, that all proposed class members performed work that was not compensated.  There is no evidence of this on a class-wide basis.  To the contrary, the cross section of employees interviewed by STR in the audit that Plaintiffs attach to their Brief at Exhibit T supports that employees did not perform work without compensation.  Rather, as discussed above, Ms. Bobryk's claims are unique to her, and Plaintiffs have not demonstrated otherwise.  Given that Plaintiffs' proposed class spans scores of different job functions in Durand's production facility, it was incumbent upon them to demonstrate to the Court how each position fit into Plaintiffs' claims.  Instead, Plaintiffs rely on their broad and unsupported claims of off-the-clock pre and post shift work across the class.

- 30 -

As demonstrated above, the alleged pre and post shift "work" that Plaintiffs' rely on to support their claims—donning and doffing PPE and changing optional uniforms—is not compensable time.   And, there is no evidence in this case of a plant-wide requirement of performing work prior to one's shift.   Plaintiffs have not even attempted to prove that each position in Durand required pre or post shift work.   Instead, they rely on Durand's general policies requiring employees to be ready to work at their scheduled shift time as a proxy for actual uncompensated work.   But, such general policies prove nothing.   For example, Packers need only to be wearing safety glasses and ear plugs to be "ready" to work.   They do not have tools, pre shift meetings, or even brief conversations with the person they are relieving.   In addition to this basic example, there are many more positions—Quality Control Inspector, Set up Decorator, Relief Operator, Forklift Driver—for which being "ready" to work means only showing up at the appointed time.   Plaintiffs have failed to articulate, much less prove, how such positions fit within their class, and have not demonstrated that these positions require pre or post shift duties.

Accordingly, Plaintiffs' argument that simply reviewing time punches will be the predominate method of proof fails to satisfy the predominance inquiry.   Plaintiffs ignore the fact that they need to prove other class members have engaged in uncompensated work and, hence, do not attempt to demonstrate that common proof will predominate over individual issues. Further, to the extent Plaintiffs seek to rely on the seven minute rounding and grace period policy, Durand has demonstrated with its discussion of ascertainability above that its policy is lawful.   And, to the extent Plaintiffs wish to demonstrate that the rounding and grace period policy did not result in neutral rounding in individual cases, such claims would require individual proof, not predominate class-wide proof.

- 31 -

3.   *Individualized Damages Questions Will Also Predominate*

Even if Plaintiffs were not barred from proceeding as a Rule 23 class by their failure to establish the existence of common proof for establishing liability to the entire proposed class, the highly individualized nature of the damages inquiry in this case precludes a finding of predominance.  In Comcast v. Behrend, 133 S. Ct. 1426 (2013), the Court explained that courts must "take a close look" at whether individualized damages questions predominate over common liability issues.  133 S. Ct. at 1432.  The Comcast Court held that a class was improperly certified because the plaintiffs "f[ell] far short of establishing that damages are capable of measurement on a classwide basis" and, as a result, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." 133 S. Ct. at 1432-33.[8]

Plaintiffs again rely on the existence of time records to claim that the individualized inquiries will not predominate the damages question.  There is no uniformly identifiable pay deficit across the class.  Proof of damages would require each individual to establish the length of time—on a daily basis—they engaged in pre and post shift activities that were not compensated.  Simply analyzing time punches under the rounding policy will not show how many minutes the employee worked beyond eight hours, or the type of activities performed

---

[8]  See also, e.g., Roach v. T.L. Cannon Corp., No. 3:10-cv-0591, 2013 U.S. Dist. LEXIS 45373, 8-10 (N.D.N.Y Mar. 29, 2013) (rejecting Magistrate's recommendation because *Comcast* clarified in the interim that Rule 23(b)(3) "requires a demanding and rigorous analysis" of all issues, including damages); Tracy v. NVR, Inc., No. 04-CV-6541L, 2013 U.S. Dist. LEXIS 62407 (W.D.N.Y. Apr. 29, 2013) ("the plaintiffs' claims - as well as any determinations to be made concerning damages — are too highly individualized to form the basis for a class action") (citing Comcast, 133 S. Ct. 1426); Cowden v. Parker & Assocs., No. 5:09-323, 2013 U.S. Dist. LEXIS 72253, at *18 (E.D. Ky. May 22, 2013) ("the Plaintiffs have offered no manageable way to calculate damages across the entire class and the individual damages calculations that would be required will inevitably overwhelm any questions common to the entire class"); Parra v. Bashas', Inc., No. 02-0591, 2013 U.S. Dist. LEXIS 76792, at *106 (D. Ariz. May 31, 2013) ("Before addressing superiority, the court also must consider whether plaintiffs' damages can be determined on a classwide basis.") (citing Comcast, 133 S. Ct. 1426).

- 32 -

sufficient to determine if work was actually performed.

The example of the six Mold Shop employees is instructive here and illustrates the interlocking and individualized nature of the liability and damages questions for each employee. Mr. Goussev—the Quality Inspector in the Mold Shop—presumably has no damages under Plaintiffs' grace period/rounding time theory of liability.   Nor is there any evidence that, as Quality Inspector in the Mold Shop, he performed pre or post shift duties, or that any such duties were required of him in order to be "ready" to work.   Rather, he did not relieve another worker, and he clocked in at or near his scheduled shift time, while usually clocking out seven minutes early.   Since July 2012, he worked past his scheduled shift time only twice.   Although less extreme examples, the three other Mold Shop employees are similar in that their punches since July 2012 show a net benefit from the grace period/rounding policy.   For the other two Mold Shop employees whose time sheets are in the record and show a net benefit to Durand from the grace period/rounding policy—even assuming that the grace period/rounding policy's lawfulness turned on a hindsight inspection despite its inherent fairness—the Court would still need to examine the outcome of each employee's punches, and then determine whether those punches are reflective of actual pre or post shift work.   Or, was the employee engaged in non-work activities for which no compensation is required?   If the employee was engaged in compensable activities, then the question becomes for how long?   Time records will not answer this critical question, as there is substantial evidence in the record that employees clocked in and then waited for their scheduled start time, often socializing or engaging in personal activities, not working.

Here, as in Comcast, individual damage calculations overwhelm any questions common

- 33 -

to the class.[9]   Further, such damage calculations are further complicated by the need for an individualized assessment of liability, including an examination of time punches and pre or post shift duties specific to each position, including whether the position requires any such duties in the first place—most do not.

> 4.    *A Class Action Is Not Superior*

In light of all the foregoing, Plaintiffs cannot make a credible claim that a class action is the best available method for the fair and efficient adjudication of the controversy.  Although not directly, Plaintiffs' proposed class effectively asks the Court to hold a trial to determine liability and damages   The mini-trials necessary to determine the membership of the class would be burdensome and endlessly wasteful.  Every employee for which Plaintiffs fail to establish liability or damages would be an inefficiency caused by class certification, and these inefficiencies would swamp the Court.  Thus, certification would promote neither fairness nor justice.

> **E.    Plaintiffs Have Not Proven That The Rule 23(a) Requirements Are Satisfied**

> 1.    *Plaintiffs Cannot Prove Numerosity*

A class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "Critically, numerosit y—like all Rule 23 requirements—must be proven by a preponderance of the evidence." Marcus, 687 F.3d at 595.  "Mere speculation is insufficient." Id. at 596.  Plaintiffs treat the numerosity requirement dismissively, by citing to the total number of Durand hourly employees and then concluding that "Plaintiffs have met the numerosity

---

[9]   Even before *Comcast*, courts made clear that certification is improper where, as here, individual damages issues are particularly complex or burdensome. See, e.g., Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 192 (3d Cir. 2001) (holding "that establishing proof of the plaintiffs' injuries and litigating the defenses available to the defendants would present insurmountable manageability problems for the District Court").

requirement . . ." (Pl. Br. at 43-44).  As explained above, this is false.  Plaintiffs have not even offered evidence to establish that anyone besides Ms. Bobryk—and perhaps Mr. Dunn, a forklift mechanic—engaged in work for which they should have been but were not compensated.  Their broad assumptions and reliance on Durand's general policy of being "ready" to work, are insufficient to meet their burden on predominance and, thus, fail to establish that there is a sufficiently numerous class.

2.     *There Are No Common Answers To Crucial Questions*

Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  In Dukes, the Court explained that commonality requires that the class members have suffered the same injury. Dukes, 131 S. Ct. at 2551.  "This does not mean merely that they have all suffered a violation of the same provision of law." Id. at 2551.  Rather, "[t]heir claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor." Id.  "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id.

The analysis must "be conducted with reference to the merits of the claims" as to which certification is sought. Merck, 2013 U.S. Dist. LEXIS 13511, at *37.  In Dukes, "proof of commonality necessarily overlap[ped] with [the plaintiffs'] merits contention that Wal-Mart engages in a *pattern or practice* of discrimination . . . because, in resolving an individual's Title VII claim, the crux of the inquiry is 'the reason for a particular employment decision.'" Dukes, 131 S. Ct. at 2552 (footnote and citation omitted).  The Court explained: "Without some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." Id.  The Court found no commonality because the

- 35 -

plaintiffs could not prove a pattern or practice of discrimination. Id. at 2557-58.

As discussed above with respect to the predominance and ascertainability inquiries, there is no common question that will resolve classwide liability. Even if Plaintiffs could prove that Ms. Bobryk engaged in work for which she was not compensated, that proof is unique to Ms. Bobryk's position as a Cold-End Electromechanic in that it relates to her gathering her tools, a bicycle, and using reports that no other positions use. Nor have Plaintiffs attempted to graft Ms. Bobryk's experiences onto the class, focusing instead on their own interpretations of polices, without evidence that such policies had any impact on employees' work habits. This is far from the "glue" *Dukes* requires.

### 3. *Plaintiffs Cannot Prove Typicality Or Adequacy*

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class" and Rule 24(a)(4) requires a finding that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(3), (4). "Typicality" analysis addresses three related concerns: (1) the legal theory and factual circumstances underlying the class representative's claims must be generally the same as those of the class; (2) the class representative must not be subject to a defense that is inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class. In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 599 (3d Cir. 2009). "Adequacy," requires proof that Ms. Bobryk "has the ability and the incentive to represent the claims of the class vigorously, . . . and that there is no conflict between the individual's claims and those asserted on behalf of the class." Hassine v. Jeffes, 846 F.2d 169, 179 (3d Cir. 1988).

Plaintiffs cannot prove "typicality" or "adequacy" for the same reasons they cannot prove ascertainability, predominance, or commonality. Moreover, although Plaintiffs spend most of

their brief attacking Durand's allegedly unlawful grace period/rounding policy, they fail to mention that Ms. Bobryk was terminated (for sleeping on the job) on August 7, 2012—just one month after Durand's grace period/rounding policy came into effect. Thus, under Plaintiffs' proposed approach of reviewing application of this policy in hindsight, there is no evidence whether this policy positively or negatively impacted Ms. Bobryk over a period of time. Rather, Ms. Bobryk's claims will focus primarily on the previous time keeping system and policies These factors, and Plaintiffs' lack of proof establishing this element, preclude a finding of "typicality" or "adequacy."

### F.   Plaintiffs Cannot Meet Their Burden For Conditional Certification of the Collective Action Under the FLSA.

Plaintiffs have not met their minimal burden, for purposes of gaining conditional certification under 29 U.S.C. § 216(b), of showing that they are similarly situated to the class they seek to represent. Specifically, a court may conditionally certify a class under the FLSA only if "the named plaintiff can show that his position was or is similar to those of the absent class members. However, unsupported assertions of widespread violations are not sufficient to meet Plaintiff's burden." Freeman v. Wal-Mart Stores, Inc., 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003) (internal citations omitted); see also Bernard v. Household Intern., Inc., 231 F. Supp. 2d 433, 435 (E.D. Va. 2002) ("Mere allegations will not suffice; some factual evidence is necessary."). Although Durand acknowledges that many courts apply a "minimal burden" at this stage, that is not necessarily the case when, as here, the parties have engaged in substantial class-based discovery. Rather, "[w]here substantial discovery has been completed, some Courts have skipped the first-step analysis and proceeded directly to the second step." Smith v. T-Mobile USA, Inc., 2007 WL 2385131, at *4 (C.D. Cal. 2007) (citations omitted); Ray v. Motel 6 Operating, L.P., 1996 WL 938231 at *4 (D. Minn. 1996) (declining to apply lenient standard at

the notice stage "because the facts before the Court are extensive"); see also Hinojos v. Home Depot, 2006 WL 3712944, at * 2 (D.Nev. 2006) (applying second step analysis, noting that it was clear that the named plaintiffs were not similarly situated, and that the action would not be manageable).

Under either standard, Plaintiffs simply have failed to adduce evidence that the named Plaintiff, Ms. Bobryk, is similarly situated to the class she seeks to represent. There are several examples set forth above of positions that do not compare at all to Ms. Bobryk's specialized position of Cold End Electromechanic in terms of pre or post shift duties, necessary PPE, tools, or position requirements. Nor have Plaintiffs attempted to provide evidence that she is similarly situated to those positions. Rather, Plaintiffs have rested their motion on generalized policies that Plaintiffs interpret as potentially requiring pre or post shift duties, such as the policy that employees be ready to work at their scheduled shift time. But, there is no evidence in this well-developed record that any such policies led to Durand's denying overtime to any group of employees, let alone the entire class.

Accordingly, there is no basis for conditionally certifying a class in this case.

## IV.    CONCLUSION

Based on the foregoing, Plaintiffs' motion for class certification should be denied.


Respectfully submitted,


Dated:  April 7, 2014                    s/Daniel H. Aiken_____
                                         Thomas J. Barton, Esq.
                                         Daniel H. Aiken, Esq.
                                         **DRINKER BIDDLE & REATH LLP**
                                         One Logan Square, Ste. 2000
                                         Philadelphia, PA 19103-6996
                                         Tel: (215) 988-2700
                                         Fax: (215) 988-2757

                                         *Counsel for Defendant Durand Glass*
                                         *Manufacturing Company, Inc.*